Ida Ambrose v. Commissioner. Jay L. Ambrose v. Commissioner.
Ambrose v. Commissioner
Docket Nos. 47175, 47176.
United States Tax Court
T.C. Memo 1956-125; 1956 Tax Ct. Memo LEXIS 167; 15 T.C.M. (CCH) 643; T.C.M. (RIA) 56125; May 24, 1956
*167 Petitioner Jay L. Ambrose, manager and virtually sole stockholder of Ambrose and Company, a Colorado corporation, negotiated an agreement on behalf of the corporation with Italian Vineyard Company for the sale and delivery of 250,000 gallons of bulk wine during 1943 to Ambrose and Company. By August 31, 1943, Italian had delivered 141,306 gallons pursuant to said agreement. Upon the full liquidation of the Colorado corporation on August 31, 1943, Jay L. Ambrose received all assets thereof, of which he sold a one-half interest to his wife, Ida. The following day all of said assets were transferred to Ambrose and Company, a partnership. Held, that the assets received from the Colorado corporation and contributed to the partnership included a legally enforceable contract to purchase 108,694 gallons of bulk wine from Italian. Held further, the fair market value of the uncompleted contract was $1.30 per gallon or a total of $141,302.20 as of the applicable valuation date. Louis M. Brown, Esq., and Werner F. Wolfen, Esq., for the petitioners. J. Earl Gardner, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion *168 This consolidated proceeding involves deficiencies in income tax determined against petitioners as follows: Docket
No.
Petitioner
Year
Deficiency
47175
Ida Ambrose
1944
$50,680.36
47176
Jay L. Ambrose
1944
56,408.88
1945
861.10
At the hearing, petitioner Jay L. Ambrose filed an amended petition alleging that the partnership assets of Ambrose and Company as of September 1, 1943, included a contract with a cost basis of $200,000 instead of $163,910.55, as claimed in the original petition, and that an overpayment of individual income taxes for the year 1944 in the amount of $21,000 resulted therefrom. Likewise, petitioner Ida Ambrose filed an amended petition at the hearing requesting a similar increase in cost basis of said contract and alleging an overpayment in her income tax for the year *169 1944 in the amount of $14,583.44. Respondent, by amended pleadings, filed April 21, 1955, denied the foregoing allegations. As petitioners did not urge the aforementioned allegations at the hearing or on brief, we deem petitioners to have abandoned any such contention with respect to a valuation in excess of that alleged in the original petitions. Moreover, in view of our ultimate resolution of fair market value, such amended pleadings would be of no avail. Petitioner Jay L. Ambrose has not disputed the deficiency determined for 1945 in his pleadings nor has he introduced any evidence in connection therewith. Accordingly, said deficiency is deemed admitted. The principal issues presented for our consideration are: (1) whether the assets which petitioner Jay L. Ambrose received upon the full liquidation of a corporation on August 31, 1943, and transferred to Ambrose and Company, a partnership, on September 1, 1943, included a legally enforceable contract to purchase 108,694 gallons of wine from Italian Vineyard Company; and (2) in the event such contract was in force, whether the contract had a fair market value, and the amount of such fair market value as of the applicable valuation *170 date. Findings of Fact The facts are partly stipulated and, to the extent so stipulated, are incorporated herein by reference. Petitioners, Jay L. Ambrose and Ida Ambrose, were at all times material herein husband and wife and resided in Denver, Colorado. For the calendar years 1943 through 1945, inclusive, Jay filed individual Federal tax returns with the collector of internal revenue for the district of Colorado. Jay also filed a timely amended return for 1943. For the year 1944, Ida Ambrose filed a timely Federal income tax return with the collector of internal revenue for the district of Colorado. Ambrose and Company (a corporation) filed a corporation tax return for the fiscal year beginning September 1, 1942, and ending August 31, 1943, in the same district. For the fiscal year beginning September 1, 1943, and ending August 31, 1944, Ambrose and Company (then a partnership) filed a partnership return with the collector of internal revenue for the district of Colorado. From about 1938 to the date of its dissolution, August 31, 1943, petitioner Jay L. Ambrose owned all of the stock except qualifying shares in Ambrose and Company, a Colorado corporation (hereinafter sometimes *171 referred to as the Colorado corporation) located in Denver, Colorado. During such period, Jay actively managed the Colorado corporation which was engaged in blending, bottling and distributing wines both as a wholesaler and retailer. The principal supplier of wine for Ambrose and Company was the Roma Wine Company of Fresno, California. Annual bulk purchases by Ambrose and Company from Roma averaged between 500,000 and 1,000,000 gallons. During September 1942, Jay learned that Roma Wine Company had been sold, making it necessary to obtain other sources of supply of bulk wine. He visited Italian Vineyard Company, hereinafter called Italian, in California, a large wine producer which owned its own vineyards at Guasti, California, and after discussing the possible purchase of bulk wine with Nicola Giulii, president and general manager of Italian, the Colorado corporation received the following letter, dated September 18, 1942: "Ambrose & Co., 4109 Brighton Blvd., Denver, Colorado
"Gentlemen: "Confirming our conversation of September 16th, Italian Vineyard Company will be glad to arrange with you, for the year 1943, the selling of approximately 250,000 gallons of Sweet and Dry wines *172 at market price, less commission of 5%, subject to war restrictions and conditions. "Either party can cancel this arrangement by written notice. "Terms: 1% 10 days or 30 days net from date of invoice with trade acceptance attached to bill of lading. "We are sure that sharing part of your business will be profitable for both concerns, and we appreciate very much your having given us an opportunity to serve you. "Very truly yours, ITALIAN VINEYARD COMPANY /s/ Nicola Giulii By NICOLA GIULII President and General Manager" The Colorado corporation sent the following telegram, dated October 22, 1942, to Italian: "ITALIAN VINEYARD CO. "815 TRANSAMERICA BLDG LOSA "WE HAVE TODAY MAILED YOU IN ACCORDANCE WITH OUR SALES AGREEMENT PURCHASE ORDERS FOR APPROXIMATELY 250000 GALLONS OF WINE TO BE SHIPPED 1943 IN ACCORDANCE WITH OUR ARRANGEMENTS THE WINES WILL BE AT THE EXISTING MARKET PRICE AT THE TIME OF SHIPMENT. "AMBROSE AND CO." The purchase orders mentioned in the above telegram called for monthly shipments of bulk wine to be delivered throughout the year 1943 to the Eppy Wine Co. of Pueblo, Colorado, (Jay's father had an interest in said company) and Ambrose and Company of *173 Kansas City, Missouri, (owned by Ida Ambrose and her brother). Subsequent to its receipt of the telegram and purchase orders from Ambrose and Company, Italian attempted to disclaim any obligation under its letter of September 18, 1942. John J. Bessolo, secretary of Italian, sent the following letter, dated October 22, 1942, and postmarked October 23, 1942: "Ambrose & Co., 4109 Brighton Blvd., Denver, Colorado
"Gentlemen: Attention Mr. J. L. Ambrose: "Pursuant to our conversation of this afternoon, we beg to inform you that it will be impossible for us to supply you with 250,000 gallons of Sweet and Dry wines for 1943. "If you will refer to Mr. Giulii's letter of September 18th, 1942, you will notice that the second paragraph of said letter states: 'Either party can cancel this arrangement by written notice.' We therefore serve notice upon you that we cancel the arrangements made in the letter referred to above. "As you well know, the shortage in the market has caused quite a depreciation in stocks and if we are to accept bulk orders it will be necessary for us to deprive ourselves of our bottling setup. There is a possibility that we may be able to let you have some wine *174 - the quantity or total it is impossible at this time to state. "Thanking you for your past favors, we are "Very truly yours, ITALIAN VINEYARD COMPANY /s/ John J. Bessolo By JOHN J. BESSOLO, "Secretary." In the fall of 1942, Martin J. Burke, an attorney located in California, was employed by the Colorado corporation to represent it in the dispute respecting the cancellation by Italian of its offer contained in the letter of September 18, 1942. Burke conferred with Nicola Giulii and obtained Italian's agreement to perform in exchange for certain concessions and revisions. The revised contract included waiver by the Colorado corporation of the 5 per cent sales commission and the 1 per cent discount for cash payment within 10 days; payment of a contract price of 75 cents per gallon, subject to compliance with the then existent regulations of the Office of Price Administration (O.P.A.); and a deposit of $15,000 cash in advance with Italian. Burke's correspondence relating to the negotiations and final agreement was thereafter destroyed in conformity with the practice of his law office to strip its files after 10 years had elapsed. After the revised agreement was accepted by *175 the parties, Jay decided that, since Ambrose and Company did not have offices in California, it would be advantageous to retain Burke to oversee the full performance of the revised agreement with Italian, and for other legal matters. Thereafter, Italian made deliveries of bulk wine to Ambrose and Company pursuant to their revised agreement. On April 20, 1943, John J. Bessolo (secretary of Italian) sent Ambrose and Company a letter offering the latter delivery of some dry white wines in bulk, subject to prior sale and the availability of tank cars, and concluded as follows: "It must also be understood that whatever amount of this wine was sold to you would have to be deducted from the total amount we agreed to sell you during the year 1943." The oral agreement alluded to above contemplated monthly deliveries of bulk wine according to tentative delivery schedules, subject to future modifications and revisions. Deliveries of bulk wine from Italian, pursuant to the agreement, began in January 1943, and continued thereafter through the year 1943. During the year it was necessary to alter the shipping schedules. The Colorado corporation received a letter from Italian, dated April 23, 1943, which *176 stated in pertinent part as follows: "Because of shortages of wine, labor and certain ingredients used in finishing, the amount of bulk wine which we will have available for shipment during each of the remaining months of 1943 is limited. We are therefore compelled to restrict monthly shipments to our customers who have placed orders for 1943 delivery, in order to apportion the available supply in a manner which is fair to all. "The tentative schedule of monthly shipments to be made upon your order is as follows: Dry White
6,000 Gallons
Muscatel
6,000 Gallons
Port
3,000 Gallons
Sherry (We will ship
6,000 gallons
per month
starting
July.) Although we hope to be able to adhere to this schedule, it is subject to modifications if required by Governmental regulation or other cause beyond our control." * * *
During the year 1943, Italian encountered some difficulty in making schedule shipments of bulk wine to Ambrose and Company because of a shortage of available tank cars. In addition, when cars were obtainable, clearance from the Stockpiling and Transportation Division of the War Production Board was necessary to move them. Under the terms of *177 the oral agreement between the parties, Italian retained the responsibility of securing the necessary tank cars. Jay L. Ambrose, however, in an effort to expedite the delivery of the bulk wine from Italian, sometimes personally assisted the latter to obtain the required tank cars. Throughout 1943, Italian had sufficient wine in its vats to complete its delivery of the 250,000 gallons which it had agreed to sell to Ambrose and Company. It was not the practice of Italian to issue warehouse receipts to its customers, and none were issued to Ambrose and Company. Italian paid the ad valorem taxes on the bulk wine which had not been shipped to the Colorado corporation. By August 31, 1943, Italian had delivered a total of 141,306 gallons of bulk wine to the Colorado corporation. At a special meeting of the stockholders of Ambrose and Company held on August 25, 1943, the stockholders voted to liquidate and dissolve the corporation. All property and assets of the Colorado corporation were distributed, assigned and transferred to Jay L. Ambrose in full liquidation of the capital stock as of August 31, 1943. The following day, a limited partnership was formed with Jay L. Ambrose as general *178 partner and his wife, Ida Ambrose, as limited partner, under the name of Ambrose and Company. The partnership continued the same business activities as formerly carried on by its predecessor. On September 1, 1943, Jay sold to his wife, Ida, an undivided one-half interest in the assets received (and to be received) from the Colorado corporation. The net value of such undivided one-half interest was then estimated to be $35,000. Ida Ambrose contributed said undivided one-half interest to the partnership. Jay transferred all of the remaining property and assets received from the corporation to the partnership for an undivided one-half interest therein. Jay managed and controlled the partnership, and received a salary of $1,000. The remaining profits were equally divided between himself and his wife, Ida. On October 13, 1943, an amended certificate of limited partnership was prepared and signed by the partners, Jay L. Ambrose, as general partner and his wife, Ida, as limited partner. Each of them contributed to said partnership an undivided one-half interest in the assets they previously had contributed to the original partnership. The following year, on September 1, 1944, Ida Ambrose *179 signed an agreement whereby she acknowledged her indebtedness to her husband, Jay, in the sum of $187,647 as of September 1, 1944, together with interest at 4 per cent from September 1, 1943. Upon the dissolution of the Colorado corporation, the agreement in question to purchase bulk wine from Italian was not shown as an asset on the final balance sheet for the Colorado corporation dated August 31, 1943. The agreement likewise was not shown as an asset in the undated opening entries of the partnership. The partnership received a letter from Italian, dated March 2, 1944. Material parts of that letter read as follows: "Receipt is acknowledged of your wire requesting that we ship you one car containing three thousand gallons Port and three thousand gallons Muscatel. * * *
"The shipment of this car will complete our commitment. "We are glad to have been able to cooperate with you and feel quite certain that our method of handling these various transactions met with your complete approval." During the period September 1, 1943, to some time in March 1944 (at which latter date the agreement with Italian had been completely carried out) Italian delivered 108,694 gallons of *180 bulk wine to Ambrose and Company, the partnership. On March 15, 1944, Jay L. Ambrose filed his individual tax return for the calendar year 1943 and reported a long-term gain of $19,821.99 from the liquidation of the corporation. In computing said gain Jay had an appraisal made of the corporation's fixed assets and valued them at their fair market value. All current assets of the Colorado corporation were valued at their book value on the final corporation balance sheet dated August 31, 1943. In computing his long-term capital gains, the agreement for the purchase of bulk wine from Italian was not shown on Jay's return as an asset received in exchange for his stock in Ambrose and Company. Several months later, Jay L. Ambrose was advised by a tax attorney that all corporate assets received by him upon the dissolution of the Colorado corporation, including the bulk wine agreement with Italian, covering the wine not as yet delivered, had to be valued at its fair market value in determining his long-term capital gain. Jay L. Ambrose computed a fair market value of $163,041 for the agreement covering the 108,694 gallons of bulk wine remaining undelivered as of August 31, 1943, by deducting *181 bottling, transit and other costs from a price ($2.25 per gallon) he estimated bulk wine would cost him if purchased in California from Roma Wine Company, his primary source of supply before making the purchase commitment with Italian. During August 1943, Ambrose and Company was able to purchase case lots of bottled sweet wine from Roma Wine Company, F.O.B., California, at $7 per case. Jay L. Ambrose adopted said price in determining the fair market value as of August 31, 1943, of the bottled wine on hand, the bulk wine inventory, and the value of the uncompleted purchase agreement for bulk wine from Italian. The figure $163,910.55 stated in his amended return and petition for the fair market value of the latter was the result of an error in calculation. In Jay's income tax return for 1943, he had assigned a value of $82,521.75 to the wine inventory received by him upon dissolution of Ambrose and Company. In his amended return for 1943, (filed August 10, 1944) Jay valued the wine inventory and the outstanding oral agreement with Italian at $339,817.52, or an increase in value for the inventory and bulk wine remaining to be delivered by Italian in the amount of $317,295.54. By undated *182 adjustments on the books and records of the partnership, the fair market value of the "inventory" contributed by Jay L. Ambrose to the partnership as of September 1, 1943, was increased from $19,821.99 to $317,295.54. Undated adjustments were also made in the partnership books to the investment account of Jay L. Ambrose to show a capital account of $203,647.77 instead of $45,000 as originally entered. Corrections were made in the partnership books to the investment account of Ida Ambrose to show a capital account of $203,647.77 instead of $45,000 as originally entered. Credits were entered on the capital accounts of each of the partners in Ambrose and Company in the amount of $158,647.77. Throughout 1943 and part of 1944, Italian charged the partnership 75 cents a gallon, F.O.B., California, for all bulk wine delivered pursuant to the terms of the purchase agreement, which was the maximum ceiling price on bulk sweet wine allowed to the vendor under prevailing O.P.A. regulations. During this period, the United States was in the midst of World War II, and as a result of various Federal prohibitions against the manufacture of alcohol from grain or the conversion of certain varieties *183 of grapes into wine, the wine industry was confronted with a critical shortage of bulk wine. To eliminate unwarranted increases in wholesaler or retailer margins of mark-ups, beginning in May 1942, O.P.A. imposed numerous and varying ceiling prices on bulk wine. No ceiling price, however, was ever placed on the grapes used in the production of wine. The cost of grapes required to produce a gallon of bulk exceeded the ceiling price that could be charged for a gallon of wine, intensifying the shortage thereof. Because of the high cost of grapes and the comparatively low ceiling price on bulk, wine processors found it more profitable to sell bottled wine than to sell the grape crush in bulk. The O.P.A. established several different ceiling prices on the sale of bottled wine. One of these ceiling prices was the highest sales price charged by a winery during March 1942. Ambrose and Company had a premium label price of $8 per case for fifths on sales to wholesalers and $10 per case of fifths on sales to retailers, and after the imposition of O.P.A. sold only under this premium label. Wineries lacking a ceiling price on March 2, 1942, on a particular kind of wine were allowed, under O. *184 P.A. regulations relating to "comparable pricing," to adopt the ceiling prices used by their competitors on sales of similar brands of wine. The O.P.A. regulations permitted a wine processor to charge any price he could obtain above the maximum ceiling price for bulk wine when sold as part of a going winery business. During 1942 through 1944, inclusive, numerous wineries were purchased in order to obtain the inventory of bulk wine. We find as an ultimate fact that the fair market price of the contract between Italian and Ambrose and Company obligating the former to deliver 108,684 gallons of bulk sweet wine to the Colorado corporation was $1.30 per gallon, or a total amount of $141,302.20 as of August 31, 1943. Opinion FISHER, Judge: Respondent determined that petitioners' estimated fair market value of $163,041 for the wine agreement in question should be disallowed in computing the partnership income for the fiscal year ended August 31, 1944, and that the individual incomes of petitioners for the calendar year 1944, accordingly, should be increased by their proportionate distributable shares of additional partnership income in the amounts of $68,709.52 for Jay L. Ambrose and *185 $68,709.51 for his wife, Ida. It is respondent's position that petitioners have not sustained their burden of establishing a valid, enforceable contract between Ambrose and Company and Italian Vineyard Company as of August 31, 1943; that, even assuming such agreement did exist, because of its indefiniteness and speculative character, the agreement had no fair market value on August 31, 1943, in the hands of Jay L. Ambrose, when received from the Colorado corporation upon its complete dissolution or when transferred to the partnership and that, therefore, the basis of the purchase agreement cannot be amortized by the partnership during its fiscal year ending August 31, 1944. We find no merit in respondent's position for the reasons stated hereinafter. Respondent, in defending his view that the agreement in issue was unenforceable for want of certainty, contends that all the Colorado corporation actually received from Italian was "the right to negotiate for the possible future delivery of bulk wine," and that Jay, upon the liquidation of the corporation, received no immediate property right to which a fair market value could be properly assigned. In support of this theory, respondent *186 argues that no legally binding obligation was established between the parties since Italian had apparently oversold its supply of bulk wine for 1943 and it was impossible to predict, as of August 31, 1943, how much or when, if ever, the wine set forth in the "tentative" delivery schedules set up by the parties would be delivered. He argues further that it was evident Italian did not wish to abide by the terms of the alleged wine agreement, emphasizing the fact that the services of an attorney were required continuously to obtain any measure of compliance with said agreement, admittedly not even reduced to writing. The facts before us support a contrary view. We are of the opinion upon a consideration of the entire record that the petitioners had a valid and subsisting contract with Italian as of August 31, 1943, to which a substantial fair market value is to be assigned. We think it unnecessary to consider whether or not Ambrose and Company acquired a legally enforceable contract on October 22, 1942, when its telegram of acceptance was placed in the channels of communication. In any event, that arrangement provided that either party could cancel by written notice. The significant *187 factor is that after Italian, by letter signed by Bessolo, its secretary, dated October 22, 1942, and postmarked October 23, 1942, gave notice of cancellation of the original arrangement, the parties entered into a new or substituted oral agreement which was, in our opinion, binding and enforceable. The new contract provided for delivery from Italian to Ambrose and Company the same quantity of wine (250,000 gallons) but fixed the price per gallon at 75 cents. It eliminated both the 5 per cent commission and the one per cent discount. Ambrose and Company was required to make an advance deposit of $15,000 with Italian. Both parties recognized the new agreement as binding. Respondent does not appear to raise any issue with respect to the Statute of Frauds, but in any event we think the requirements of the statute were satisfied by the deposit or down payment of $15,000 made by Ambrose and Company (the corporation), and by the actual deliveries made by Italian well prior to August 31, 1943. Deering, California Civil Code, sec. 1624(a). The negotiations for the contract were carried on for Ambrose and Company by Martin J. Burke, its attorney, with officials of Italian. Burke appeared *188 as a witness, and we have no doubt from his testimony (as well as from the conduct of the parties) that the revised contract as entered into (and carried out) was a valid and subsisting contract, fully understood by both parties, in terms which were sufficiently definite to be binding and enforceable. That Italian considered itself bound is indicated not only by its conduct in making deliveries, but also by its correspondence with Ambrose. Thus, under date of April 20, 1943, John Bessolo, secretary of Italian, addressed a letter to the partnership affirming its acknowledgment of their contractual relationship. Likewise, by letter dated March 2, 1944, Italian again expressed its recognition of the contract and its intention to abide by its commitment. Moreover, the testimony of Bessolo makes it quite clear that Italian considered itself bound. We believe that respondent, in emphasizing the absence of a rigid delivery schedule, has overlooked the fact that wartime conditions required of necessity that contracts be performed in a more flexible manner than would prevail under a peacetime economy. Obviously, the parties were cognizant of this situation and contemplated a reasonable measure *189 of flexibility in the execution of their contract as evidenced by the "tentative schedules" they arranged. We recognize that such delivery arrangements are often provided in business transactions in order to secure the necessary elasticity of performance with regard to matters, such as availability of raw materials and transportation facilities, known to be uncertain at the time of negotiating a contract. The fact that it took about two months longer than the period originally indicated does not render the contract void or unenforceable for lack of certainty. See Kentucky Tobacco Products v. Lucas, (D.C.W.D.Ky., 1925) 5 Fed. (2d) 723; 1 Williston, Contracts, rev. ed. (1936) sec. 38, p. 102. Nor are we impressed with respondent's further argument that the contract was unenforceable because there was no assurance, in view of the acute shortage of bulk wine, that Italian would be able to obtain the wine during 1943 for delivery to Ambrose. The record shows that Italian owned its own vineyards and apparently had a ready supply of raw materials required for the production of the amount of wine which it had agreed to sell to Ambrose and Company. Bessolo (who undoubtedly was *190 in the best position to know Italian's situation during August 1943) testified that Italian always had enough wine on hand during 1943 to fulfill all of its outstanding contractual commitments. Moreover, the best objective proof of the fact that Italian had sufficient bulk wine on hand was its delivery of 250,000 gallons of such wine to Ambrose when there was an extreme shortage of wine in the open market. Finally, we cannot see where the use of a California attorney by Ambrose and Company to supervise the performance of the contract in any way affects its validity. In view of our conclusion that the agreement here in issue constituted a valid and enforceable contract between the parties, it is unnecessary for us to consider respondent's theory that the existence of a contractual agreement rendered unenforceable because of vagueness or uncertainty of performance would preclude treatment thereof as an asset for tax purposes. See U.S. Industrial Alcohol Co., 42 B.T.A. 1323, 1345 (1940), reversed on other grounds, 137 Fed. (2d) 511 (C.A. 2, 1943). We turn next to the determination of the fair market value of the uncompleted contract in issue as of August 31, 1943, calling *191 for delivery of 108,694 gallons of bulk sweet wine. Respondent, relying on the same factors, among others, urged with respect to the first issue, contends that the fair market value of said contract was nil or nominal. On the other hand, petitioner contends that the fair market value of the wine contract is $1.50 per gallon. It is well established that fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being informed of the material considerations. Of course, the fair market value of a contract at a particular time is a question of fact, to be determined from all the circumstances connected with the agreement, and there is no single formula universally applicable in determining such value. Meadow Land & Improvement Co. v. Commissioner, (C.A. 3, 1941) 124 Fed. (2d) 297. In the instant case, our ultimate finding of a fair market value of $1.30 per gallon for the contract herein involved on the date of the contribution of said contract to the *192 partnership represents our conclusion, based upon a consideration of all the relevant testimony, exhibits, and stipulated facts in the entire record. No attempt, however, will be made here to re-examine the intricacies of the experts' valuation or to enumerate all the factors to which the witnesses gave consideration. We think it appropriate, however, to comment generally upon the more significant elements which we have taken into consideration in evaluating their testimony and conclusions. Although we have, to a large extent, relied upon the testimony of the experts, Gomberg and Bisceglia, for the reasons hereinafter set forth, we are unable to accept the precise value determined by either of them. We have also given careful consideration to the views expressed by Jay Ambrose. We refer briefly to the testimony of each. Jay arrived at a fair market value of $1.50 per gallon. He reached this conclusion by making use of certain purchases of case lots of bottled sweet wine from Roma Wine Co. during August 1943, for which Ambrose and Company paid $7 per case, F.O.B., California. By adding to said price index certain taxes and shipping charges to Denver, Colorado, Jay determined the cost *193 per case of bottled Roma Wine delivered to Ambrose and Company. Then by deducting therefrom bottling and shipping costs and various taxes Ambrose and Company would have incurred if it had purchased bulk wine in California, and had bottled it itself in Denver, Jay arrived at the effective price paid by the Colorado corporation to Roma for one gallon of bulk sweet wine. By deducting therefrom the contract price of 75 cents per gallon, he determined the fair market value to be $1.50 per gallon or $163,041 on the critical date for the remaining gallons of wine to be delivered by Italian. It is evident that petitioner's approach is faulty since he has applied the bottling and labor costs as well as the contract price of wine of Ambrose and Company to Roma's ultimate wholesale price which is composed of several unknown elements, such as markup of profit, cost of raw materials and production costs. We cannot rely fully upon petitioner's assumption that Roma and his own company would have identical costs of production, there being no suggestion in the record to support such a view. Gomberg, the first of the two experts called by petitioner, made a detailed analysis of the net realizable *194 value or profit that would accrue on the applicable valuation date to a suppositious purchaser of the contract in issue. Corroborating petitioner's valuation, he arrived at a market value of $1.50 per gallon. The witness reached this conclusion by using a composite of several different techniques of valuation. At first, the witness computed the profit realizable by Ambrose and Company on the uncompleted contract if the company retained it themselves. Thus, if Ambrose and Company bottled the bulk wine and sold the wine at the maximum O.P.A. ceiling prices for its premium brand (of $8 per case to wholesale trade, F.O.B. California, and $10 per case to retail trade), Ambrose could realize a profit of (1) $1.66 for the contract right to buy one gallon of wine for resale to the wholesale trade, and (2) $2.39 for resale to the retail trade. Then resorting to a different technique, the witness estimated that if Ambrose and Company sold the contract, the supposititious purchaser with the same ceiling prices of Ambrose would be willing to pay about $1 or $1.25 per gallon for the contract right to sell a case at $8 wholesale; and if the willing purchaser had available to him a retail price *195 of $10 reflecting a net realizable profit of $2.39, he would be willing to go as high as $1.50 or $1.75. Upon further examination, Gomberg, using a composite valuation of the aforementioned estimates, concluded that if an average were taken of the wholesale and retail business in the wine industry as of the critical date at between $8 and $10 a case, a willing purchaser with such ceilings available to him under O.P.A. would pay $1.50 per gallon for the contract right to purchase the wine from Italian at 75 cents per gallon. Although his valuation was predicated on the value of the contract if sold alone to a hypothetical purchaser, the witness was fully aware that under prevailing O.P.A. regulations it was legal to charge whatever price a purchaser would pay for the contract in issue if it were sold as part of the entire winery, and that during the war years it was common to practice to purchase wineries to obtain their inventories. See Particelli v. Commissioner, 212 Fed. (2d) 498 (C.A. 9) affirming a Tax Court Memorandum Opinion of this Court [11 TCM 150,]. The witness considered this factor in his valuation, stating that the sale of an entire winery *196 such as Ambrose and Company solely to obtain its wine inventory could readily have occurred as of the applicable valuation date. It is evident that Gomberg was thoroughly familiar with all economic facets of the wine industry during the years involved herein, having been employed as research director of the Wine Institute (a trade association for the wine industry) and as industry consultant with the O.P.A. He was fully qualified, in our opinion, to give expert testimony on the fair market value of the contract in issue and expounded his views persuasively. The witness, of course, testified that he had taken numerous factors into consideration, but we believe his end result neglected to give adequate weight to the problem of transportation and to the fact that the contract was oral (although confirmed in writing in a broad sense by correspondence and the conduct of the parties). Although the witness stated that he had given full consideration to the depressive influences on value occasioned by the shortage of tank cars for transporting the wine, it is our view that he minimized this factor, maintaining that if tank cars were unavailable, alternative means of delivery could be readily *197 obtained. There is ample evidence to confirm the seriousness of this factor that he treated so casually in his calculation. The record shows that substantial difficulties were encountered by Italian in delivering the wine, and that at times it was necessary, contrary to industry custom, for Jay personally to obtain the necessary tank cars to deliver the wine to Denver. We think a prospective purchaser would have considered this impediment under then existing conditions to be much more significant than did Gomberg. Considering the existent shortage of tank cars during a war period, we believe the witness should have given more weight to the likelihood of a willing purchaser of the contract being unable to transport wines by conventional means. Admittedly, in the absence of tank cars, such a purchaser may have taken delivery of the wine in California or may have arranged other means of transportation, but he would, we think, have had in mind, in fixing the value of the contract, that such alternate means of obtaining delivery might not only have resulted in higher shipping charges but might well have affored less satisfactory assurance of timely delivery. There is no suggestion in *198 the record that improvised means of transportation mentioned by the witness would cost no more than shipment by tank cars or that it was readily available when required. We believe, therefore, that transportation was a significant factor which should have been given more realistic consideration by the witness since it would unquestionably have had some influence on the amount a willing buyer would have paid for the contract. There is nothing in the record to indicate that Gomberg gave any consideration to the fact that there might be difficulty in procuring a willing buyer of a verbal contract (which had already been the subject of some dispute), despite the subsequent recognition of the contract. This is of particular significance because of the fact that the contract was highly favorable to Ambrose while Italian was performing the agreement at an economic loss. We think that a prospective purchaser would have hesitated to obligate himself, despite the favorable nature of the contract, unless and until he was able to have the wine agreement reduced to writing and executed by Italian. Absent the above, a purchaser would no doubt have given careful consideration before buying a potential *199 law suit. Petitioners' second witness, Bisceglia, by computing the value of the wine contract when sold as part of an entire winery, arrived at a fair market value of $1.40 per gallon, without regard to its ultimate sale to wholesale or retail trade. The witness was well qualified as an expert on the value of said contract by his many years of experience in the wine industry. Notwithstanding the 10 cent differential reached in their opinions, he substantially corroborated the over-all view of J. L. Ambrose and Gomberg. Like the first expert witness, Bisceglia testified that transportation difficulties would pose no particular problem to a willing purchaser, and apparently gave little or no weight to this element which we have indicated would, in our opinion, have appreciable bearing on the valuation herein. Likewise, there is nothing to indicate that he gave any weight to the fact that the contract was oral. Our views in this respect have already been discussed in connection with Gomberg's testimony. We have considered respondent's contention that the two expert witnesses, in rendering their opinion, overlooked or minimized the fact that the temporary nature of O.P.A. price controls *200 created an abnormal market on bulk wine prices, which were subject to radical decline at any time in the event of peace. Such risk was faced by virtually all business during that period. While the chance of a drop in the market was necessarily an inherent part of the picture, we think it clear that there was no imminent likelihood of peace as of the applicable valuation date. We believe that the witnesses adequately considered this contingency. Respondent introduced no evidence in rebuttal. Nevertheless, we are not required to adopt the valuation of one or the other expert when an appraisal of all of the factors indicates that the resultant valuations arrived at by the witnesses was too high. Perhaps we may best characterize the testimony by describing it as very helpful, but nevertheless definitely on the optimistic side from the standpoint of Ambrose. In our own approach to the issue of valuation, we have given careful consideration to all of the testimony of petitioner himself and his two expert witnesses. We have given the weight we deemed appropriate to the adverse effect of potential transportation difficulties, the loose manner in which the contract was evidenced, and the *201 other depressive factors which are apparent from the testimony of the witnesses themselves. The facts do not present a situation which is readily adaptable to the application of any mathematical formula or the determination of an exact figure. On the basis of our careful analysis of the entire record, we have fused the pertinent elements of the witnesses' testimony, and have reached the conclusion that the fair market value of the bulk wine was $1.30 per gallon or $141,302.20 for the uncompleted contract as of the applicable valuation date. With respect to the propriety of carrying the cost basis of the contract in the opening inventory of the partnership books, petitioners, on reply brief, now concede that the entire basis of the wine contract should be treated as a depreciable asset in computing partnership income. All of the bulk wine in issue was delivered within the partnership's fiscal year ending August 31, 1944. *
Respondent, on brief, makes the following statement: "Should the Court find that the partnership acquired an *202 enforceable contract to purchase 108,694 gallons of wine, and that such contract had a fair market value, the respondent concedes that the entire amount of such basis should be recovered in the partnership fiscal year ended August 31, 1944, inasmuch as the wine was eventually delivered within such taxable period." In view of the concessions of the parties, and the fact that we have herein held that the contract was enforceable and had a fair market, we hold that the basis should be recovered in the partnership fiscal year ended August 31, 1944. We may add that this is consistent with our views expressed in our Supplemental Opinion in Murray Thompson, 21 T.C. 448 (1954). Decisions will be entered under Rule 50. Footnotes
*. This date previously read "1954". The change was made in an official Order of the Tax Court, dated June 11, 1956, and signed by Judge Fisher↩.