Reese **SCHONFELD,** individually and derivatively as shareholder of International News Network, Inc., Plaintiff–Counter–Defendant–Appellant,

v.

Russ **HILLIARD,** Les Hilliard and International News Network, Inc., Defendants–Counter–Claimants–Appellees.

Docket No. 99–7852.

United States Court of Appeals, Second Circuit.

Argued: March 16, 2000.

Decided: July 5, 2000.

Bruce E. Fader, Proskauer Rose LLP, New York, NY (David A. Picon and Amy S. Park, of counsel), for Plaintiff–Appellant.

William G. Dittrick, Baird, Holm, McEachen, Pedersen, Hamann and Strasheim, Omaha, Neb. (Jill Robb Ackerman and D. Nick Caporale, of counsel, Gary Greenberg, Orans, Elsen & Lupert, New York, NY, of counsel ), for Defendants–Counter–Claimants–Appellees Russ Hilliard and International News Network, Inc.

James P. Murphy, Murphy, Kirkpatrick & Fain, PLLP, Billings, Mont. (Allen P. Rosiny, New York, NY, of counsel), for Defendant–Counter–Claimant–Appellee Les Hilliard.

Before: McLAUGHLIN, SACK and KATZMANN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

## BACKGROUND

This case involves a closely-held cable television corporation that imploded just as it was about to launch its flagship channel. In 1988, brothers Russ and Les Hilliard formed International News Network, Inc. ("INN") to distribute a British news and information channel in the United States (the "Channel"). Prior to this ambitious venture, the Hilliard brothers owned small mid-western cable television companies with an aggregate of only 66,000 subscribers.

To secure large-scale expertise and prestige, INN brought in Reese Schonfeld, a founder and former President of Cable News Network ("CNN")—initially as a consultant, and later as a shareholder—to help INN negotiate with the British Broadcasting Corporation (the "BBC") for a programming license. INN also retained Daniels & Associates ("Daniels"), the nation's leading financial services company for the cable industry, to prepare a business plan and to drum up investors.

In February 1994, the Hilliards and Schonfeld executed a written Shareholders' Agreement whereby each became a one-third shareholder in INN in return for a $10,000 capital contribution. In addition, the Hilliards, who had each already lent $300,000 to INN, agreed to lend up to another $350,000 to INN if necessary to meet its obligations to the BBC. In lieu of a further cash contribution, Schonfeld agreed to invest his time and effort.

The Shareholders' Agreement confirmed the parties' understanding that INN itself would not operate the Channel. Instead, INN would invest in a yet-to-be-formed operating entity. INN's shareholders, if they chose, could increase their personal stakes in the Channel by making additional cash investments in the separate operating entity. The agreement said nothing about the percentage of profits that INN, or any other equity investor, would receive from the Channel's operation.

Although the Shareholders' Agreement provided for a two-member board of directors (one chosen by Schonfeld, the other by the Hilliards), no board members were formally designated. It appears, however, that Schonfeld assumed the three roles of director, President and CEO of INN. Russ Hilliard acted as the other director. Les Hilliard apparently played no role in INN, other than investor.

The final piece of the puzzle fell into place on March 4, 1994, when the BBC granted INN a 20–year exclusive license to distribute its news and information programming in a 24–hour format, commencing not later than February 1995 (the "March Supply Agreement"). The agreement provided for INN's assignment of the benefits and privileges of the agreement to the yet-to-be-formed operating entity upon written consent of the BBC, whose consent would not be unreasonably withheld. The BBC retained its right, however, to withhold consent to any delegation of INN's duties under the contract.

As INN's first step to implement the March Supply Agreement, and based on assumptions and figures provided by the Hilliards and Schonfeld, Daniels prepared a revised business plan for INN (the "INN Business Plan"). Schonfeld and Russ Hilliard used this revised plan to attract investors.

Soon after the execution of the March Supply Agreement, Cox Cable Communications ("Cox"), one of the largest cable operators in the United States, entered the picture. Cox wanted to launch two BBC channels in the United States—one with news and the other with entertainment programming. However, because of INN's exclusive programming rights, Cox would be unable to operate the news channel. Accordingly, Cox offered to purchase INN's contract rights for $1.7 million cash ($700,000 at closing and $100,000/year for ten years thereafter), plus a 5% equity interest in both of Cox's proposed BBC channels.

Finding Cox's offer reasonable, INN entered into a letter agreement with Cox on June 2, 1994 accepting the proposed terms of sale (the "Cox Agreement"). Under the Cox Agreement, Cox retained the right to buy out INN's 5% interest in the BBC channels in their tenth year of operations. The price that Cox agreed to pay for that interest was 20% of the tenth-year gross revenues of both channels. The parties agreed to enter into certain "definitive" agreements (i.e., a Shareholders' Agreement, Buy–Out Agreement and consulting agreement for Schonfeld) once they received final approval from the BBC.

In light of the Cox negotiations, INN and the BBC agreed to temporarily suspend the March Supply Agreement. This, in turn, required a postponement in the Channel's launch date for several months.

Although the BBC had approved all financial aspects of the Cox deal, in August 1994, the BBC, on behalf of Cox, requested an extension of time to work out certain editorial issues concerning the proposed entertainment channel. Having decided to pursue the profits from the Channel themselves rather than selling out to Cox, the Hilliards denied this request. Schonfeld reluctantly agreed to abort the Cox deal.

In October 1994, the FCC promulgated a new rule allowing cable operators to charge an increased per-channel monthly rate for up to six new channels as of January 1, 1995. To take advantage of this window of opportunity, INN asked the BBC to accelerate the launch date of the Channel.

INN and the BBC signed an "Interim Agreement," effective December 14, 1994, in which the BBC agreed to provide provisional programming as early as possible, and to develop an "Americanized" programming format to become available to INN no later than December 31, 1995 under a revised 20–year supply agreement (the "December Supply Agreement"). In consideration for the interim programming feed, INN agreed to pay the BBC approximately $20 million in installments beginning January 3, 1995. The BBC retained the right to terminate the Interim Agreement if, by January 31, 1995, INN had failed to get letters indicating an intent to carry the Channel from cable systems with an aggregate of at least 500,000 subscribers. The December Supply Agreement also: (1) capped INN's initial capital contribution to the operating entity at 15%; and (2) gave the BBC a non-dilutable 20% equity interest in the operating entity.

According to three witnesses—Richard Blumenthal (INN's attorney), Schonfeld and Mark Young (a representative of the BBC)—Russ Hilliard repeatedly promised orally that he and his brother would personally fund the Interim Agreement. These promises were allegedly made to induce Schonfeld and the BBC to abandon the March Supply Agreement and enter into the Interim and December Supply Agreements despite the fact that INN did not yet have the cash available to make the necessary payments to the BBC. Schonfeld and Blumenthal testified in depositions that the Hilliards said they planned to invest up to $20 million in the operating entity as financing for the BBC payments. However, there is no oral or written agreement memorializing the precise amount promised, or defining the liabilities and remedies of the parties in the event of the Hilliards' failure to fund.

By mid-January 1995, the Hilliards had provided none of the promised funding and INN was in default under the Interim Agreement. In February 1995, the parties met in New York to discuss the situation.

Russ Hilliard did not deny that he and his brother had promised to fund the Interim Agreement. He claimed, however, that funding had been withheld because INN was having difficulty obtaining cable operator support. Rather than suing the Hilliards and INN for breach of contract, the BBC offered a chivalrous solution: in exchange for the dissolution of both the Interim and December Supply Agreements, the BBC agreed to release the Hilliards and INN from any and all claims arising out of their breach of the oral agreement and Interim Supply Agreement.

Schonfeld alleges that the Hilliards never really intended to fund the Interim Agreement themselves. He claims that, all along, they had been unsuccessfully attempting to get the money from William Bresnan, the CEO of Bresnan Communications (which is 80% owned by TCI Cable). Russ Hilliard has admitted in deposition testimony that: (1) the funds he had promised were supposed to come from Bresnan or TCI, not from himself and his brother; and (2) he knew the BBC would never have signed the Interim Agreement had it known the truth (*i.e.*, would never have agreed to make the Interim Agreement contingent on funding from Bresnan or TCI).

In April 1995, Schonfeld commenced this diversity action in the United States District Court for the Southern District of New York (Mukasey, *J.*). Schonfeld alleged derivative claims on behalf of INN for: (1) fraud; (2) breach of contract; (3) promissory estoppel; (4) breach of the fiduciary duties of loyalty and care; and (5) mismanagement and waste of corporate assets. He also advanced personal claims for: (1) breach of contract; (2) promissory estoppel; and (3) breach of the fiduciary duties of loyalty and care.

In a nutshell, Schonfeld alleged that the Hilliards induced him and INN to abandon the March Supply Agreement and enter into the Interim and December Supply Agreements by falsely representing their intention to personally fund the Interim

Agreement. He alleged that the Hilliards' breach of this oral agreement to fund led directly to INN's breach of the Interim Agreement and subsequent loss of the December Supply Agreement.

The damages requested by Schonfeld fall under three distinct categories: (1) lost profits that INN would have received had the Channel been successfully launched; or (2) in the alternative, the market value of the lost supply agreements ("lost asset" damages); and (3) punitive damages (solely in connection with his fraud and breach of fiduciary duty claims).

After discovery, the Hilliards moved for summary judgment arguing that, under governing New York law, Schonfeld could not establish lost profits or lost asset damages, and was not entitled to punitive damages. The Hilliards also contended that the oral promise to fund the Interim Agreement was unenforceable because it was too indefinite and not in writing.

To establish lost profit damages, Schonfeld relied on: (1) INN's Business Plan; (2) the revenues projected by Cox in connection with its own proposed BBC news channel; (3) the BBC's, the Hilliards' and Schonfeld's "belief" that the proposed operating entity would be profitable; and (4) the reports and deposition testimony of two damage experts—Donald Curtis and William Grimes.

Donald Curtis, a certified public accountant at Deloitte & Touche LLP, testified that damages from lost profits were between $112 to $269 million. Curtis based these figures on the revenue and expense projections contained in the INN Business Plan. William Grimes, a cable industry executive, testified to the assured success of the Channel by comparing it to other cable channels such as CNN and The Learning Channel. The defendants moved to preclude the testimony of these experts for failure to meet the scientific reliability standards set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

With respect to lost asset damages, Schonfeld relied entirely on the purchase price contained in the Cox Agreement to establish the market value of the March and December Supply Agreements. Calculating a present value for the portion of the purchase offer that comprised a 5% equity interest in the Cox channels, and adding this amount to the cash portion of the offer, Curtis concluded that the total purchase price agreed to in the Cox Agreement was $17.13 million.

Relying on *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986) ("*Kenford I* "), the district court held that Schonfeld could not prove, with reasonable certainty, the existence or amount of damages for lost profits. With respect to Curtis's expert testimony, the district court noted that "the technique used probably would not survive a *Daubert* inquiry." The court, however, declined to exclude the evidence under *Daubert* because it had already held that Schonfeld failed to establish a foundation for the existence of damages for lost profits.

Finding Schonfeld's claims for lost asset damages to be nothing more than a "back door" attempt to recover lost profits, and again relying on *Kenford I,* the district court held that Schonfeld could not establish lost asset damages with reasonable certainty because the value of the supply agreements also depended on their ability to generate profits. In addition, the district court held that Schonfeld had failed to establish that the supply agreements were "recoverable assets." All expert testimony proffered to establish their market value was, therefore, excluded as irrelevant.

Finally, the court ruled that, as a matter of law, Schonfeld was not entitled to punitive damages.

Accordingly, the district court granted summary judgment dismissing all claims, with the exception of the fraud claim (which the court limited to out-of-pocket

damages of $15,000). The ground for the sweeping dismissal was that Schonfeld had failed to demonstrate any damages. The defendants' arguments concerning the enforceability of the alleged oral contract were not addressed. *See Schonfeld v. Hilliard*, 62 F.Supp.2d 1062 (S.D.N.Y.1999).

Plaintiff, Schonfeld, now appeals, arguing that the district court erred by: (1) excluding the expert testimony offered to support his claim for lost asset damages; (2) dismissing all claims (other than fraud) for failure to establish the existence of, or entitlement to, the damages sought; and (3) limiting his recovery under the fraud claim to $15,000.

For the reasons set forth below, we affirm in part, reverse in part, vacate and remand.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*, drawing all inferences and resolving all ambiguities in favor of the non-movant. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir.2000). Summary judgment is proper only if the admissible evidence establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The issues before us on appeal are whether Schonfeld adduced sufficient evidence to establish the existence of damages for lost profits or lost assets, and his entitlement to punitive damages.

### I. *Lost Profits*

Schonfeld argues that the district court erred by dismissing his damage claims for lost profits. We agree with the district court.

■ In an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty. *See Kenford I,*

67 N.Y.2d at 261, 493 N.E.2d at 235, 502 N.Y.S.2d at 132. "[T]he damages may not be merely speculative, possible or imaginary." *Id.* Although lost profits need not be proven with "mathematical precision," they must be "capable of measurement based upon known reliable factors without undue speculation." *Ashland Mgt. Inc. v. Janien,* 82 N.Y.2d 395, 403, 624 N.E.2d 1007, 1010, 604 N.Y.S.2d 912, 915 (1993). Therefore, evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate. *See Kenford I,* 67 N.Y.2d at 261, 493 N.E.2d at 235, 502 N.Y.S.2d at 132. Projections of future profits based upon "a multitude of assumptions" that require "speculation and conjecture" and few known factors do not provide the requisite certainty. *Id.,* 67 N.Y.2d at 262, 493 N.E.2d at 236, 502 N.Y.S.2d at 133.

■ The plaintiff faces an additional hurdle: he must prove that lost profit damages were within the contemplation of the parties when the contract was made. *See Ashland Mgt.,* 82 N.Y.2d at 403, 624 N.E.2d at 1010, 604 N.Y.S.2d at 915. "The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made." *Id.* Where the contract is silent on the subject, the court must take a "common sense" approach, and determine what the parties intended by considering "the nature, purpose and particular circumstances of the contract known by the parties ... as well as what liability the defendant fairly may be supposed to have assumed consciously." *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 319, 537 N.E.2d 176, 179, 540 N.Y.S.2d 1, 4 (1989) (*"Kenford II"*) (internal quotation marks and citation omitted); *accord Ashland Mgt.,* 82 N.Y.2d at 404, 624 N.E.2d at 1011, 604 N.Y.S.2d at 916.

The district court found Schonfeld's lost profit claims "highly analogous" to those raised in *Kenford I.* We do too. In *Kenford I,* Erie County had entered into a

contract with the Kenford Company, Inc. and Dome Stadium, Inc. ("DSI") for the construction and operation of a domed stadium. 67 N.Y.2d at 260, 493 N.E.2d at 234, 502 N.Y.S.2d at 131. In exchange for the donation of the land, the contract provided that the County would begin construction within 12 months of the contract date and that, upon its completion, the County would enter into a 20-year management agreement with DSI. *See id.,* 67 N.Y.2d at 260, 493 N.E.2d at 234-35, 502 N.Y.S.2d at 131-32. DSI sued the County for breach of contract when construction was not timely commenced, seeking lost profits that it would have received under the management agreement. *See id.,* 67 N.Y.2d at 260, 493 N.E.2d at 234, 502 N.Y.S.2d at 131. The Court of Appeals held that DSI could not recover lost profits because their existence could not be proven with sufficient certainty. *See id.,* 67 N.Y.2d at 262-63, 493 N.E.2d at 236, 502 N.Y.S.2d at 133.

■ Here, the district court concluded that the Channel was a new entertainment venture similar to the proposed stadium in *Kenford I.* The operating entity's profits, the court noted, "were purely hypothetical, stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and carriers." *Schonfeld,* 62 F.Supp.2d at 1079. After reviewing the seemingly endless list of assumptions upon which Schonfeld's expert relied in determining lost profits, the court held that Schonfeld could establish neither the existence nor the amount of lost profits with reasonable certainty. The court also concluded that lost profits were not within the contemplation of the parties. We fully agree with the district court's analysis.

### A. The Channel's Status as a "New Business"

To evade the *Kenford I* analysis, Schonfeld argues that the district court should not have characterized the Channel as a "new business." He emphasizes that he and the Hilliard brothers were experienced cable channel operators and BBC news programming has been distributed around the world for many years. Accordingly, he claims that the Channel is more analogous to the introduction in *Ashland* of a new but tested investment strategy by an existing financial management corporation with an extensive customer base. This argument is unpersuasive.

It is undisputed that the Channel's operating entity never saw the light of day. Had the entity been created, it would have introduced first an existing product, BBC international news programming, and then a *new product,* the "Americanized" version, into a *new market,* the United States. In addition, the Channel had no established customer base. The Hilliards had only 66,000 subscribers and Russ Hilliard testified that they were having trouble finding the 500,000 subscribers necessary to preclude the BBC from terminating the March Supply Agreement. Finally, the Hilliards, Schonfeld and the BBC had never jointly operated a cable channel, so there is no historic record of operations from which lost profits could be projected. Therefore, the district court correctly determined that the Channel would have been a new business.

### B. Reasonable Certainty of Lost Profits

Schonfeld contends that the existence of lost profits was sufficiently established by the evidence that Cox, Schonfeld, the Hilliards and the BBC all *believed* that profits from the Channel were reasonably certain. However, "[t]he entrepreneur's 'cheerful prognostications' are not enough." 1 *Dobbs Law of Remedies* § 3.4. Further, Cox's profit projections for the international news channel were based on Cox's *own* existing cable operations. INN and the non-existent operating entity had no such established operations. Indeed, Schonfeld's expert, Curtis, admitted that if Cox's projected costs replaced those in INN's

Business Plan, the Channel would be doomed as "a lost venture."

In addition, the district court properly held that Curtis's projections based on INN's Business Plan are legally insufficient. These projections presume that: (1) an operating entity would have been formed and operated for 20 years; (2) an estimated $44 million in pre-launch financing would have been raised; (3) the hypothetical subscriber levels would have been reached; (4) carriage agreements would have been entered; (5) advertisers would have been found at the assumed rates; (6) all projected expenses would have proved correct; (7) marketing costs would have remained constant and expenditures would have been sufficient to attract and maintain subscriber interest; and (8) the type and amount of equity interest held by each investor, including INN, would have been determined in the manner alleged by Schonfeld. Curtis was unaware that some cable owners are paid to carry a channel and admitted that, if the Channel's operating entity had to pay for carriage, it would not survive.

Subject as they are to the changing whims and artistic tastes of the general public, claims for profits lost in unsuccessful entertainment ventures have received a chilly reception in the New York courts. See Kenford I, 67 N.Y.2d at 262–63, 493 N.E.2d at 236, 502 N.Y.S.2d at 133; Melvin Simensky, Determining Damages for Breach of Entertainment Agreements, 8 Ent. and Sports Law. 1, 12–13 (1990) (collecting cases). Curtis believes he adjusted his profit figures to take such factors into account by providing for a 25% variance on the projected cash flows of the operating entity. In his deposition, he stated that he chose the 25% variance based on his experience with the cable industry. However, Curtis failed to establish that this variance would adequately account for any inaccuracies in the revenue and expense assumptions discussed above as well as any

changes in consumer demand for British-style news reporting.

Indeed, Curtis failed to account for the effects of any general market risks on the Channel's probability of success. These risks include: (1) the entry of competitors; (2) technological developments; (3) regulatory changes; or (4) general market movements. As the district court correctly noted, "[f]ailure to control for adverse market conditions allows the false inference that plaintiff's venture was an assured success." Schonfeld, 62 F.Supp.2d at 1074. Therefore, the court properly held that Schonfeld failed to establish a foundation for the existence of lost profits.[1]

In addition, Grimes's testimony regarding likely profits based on his comparisons to existing cable channels was properly rejected. It rested on a foundation of sand. Schonfeld failed to establish the high degree of correlation between INN or the non-existent operating entity and the proffered firms (in terms of, inter alia, investors, management and cost structures) upon which the probative quality of this evidence depends. See, e.g., S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 852 (2d Cir.1987) (evidence concerning parent corporation admissible with respect to subsidiary); 3 Dobbs Law of Remedies at § 13.4(3) (profits of another entity are relevant if "plaintiff's business bears a close comparison" to the proposed business, "the products or services involved are standardized," and the profits "do not depend heavily on local or personal management skills").

■ Schonfeld contends that the district court ignored the "wrongdoer rule" which Schonfeld believes required that the burden of uncertainty as to the amount of damages be shifted to the Hilliards. The "wrongdoer rule," however, is not that broad. It provides that, "when the existence of damage is certain, and the only uncertainty is as to its amount, . . . the

---

1. For this reason, the district court did not, and we need not, reach the issue of whether Curtis's expert testimony should be excluded under Daubert and its progeny.

burden of uncertainty as to the amount of damage is upon the wrongdoer." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir.1977) (emphasis supplied). The rule does not apply here for the simple reason that the *existence* of lost profit damages cannot be established with the requisite certainty. *See id.*

### C. The Contemplation of the Parties

Finally, Schonfeld maintains that he adduced sufficient evidence to establish that liability for lost profits was within the parties' contemplation at the time the Hilliards promised to fund the Interim Agreement. He contends that this case is similar to *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir.1994) where we upheld an award of lost profits when TWA breached its duty of good faith and fair dealing under a joint venture agreement with Travellers to market Travellers' getaway packages. We disagree.

In *Travellers,* the plaintiff was seeking to recover profits that would have been realized under the very contract that the defendant was accused of breaching. Further, we noted that TWA had "near exclusive control" over the marketing of the getaway packages and, therefore, the profitability of the business. *Id.,* 41 F.3d at 1578. Thus, when it renewed its contract with Travellers, it "fairly may be supposed to have assumed consciously that lost profits damages would be an appropriate remedy" or at least "to have warranted Travellers reasonably to suppose that TWA had assumed such liability." *Id.* (internal quotation marks and citation omitted).

Our case is distinguishable in several respects. Schonfeld is not seeking profits that would have accrued under the alleged oral agreement to fund, or even under the Interim Agreement. Rather, Schonfeld wants to recover lost profits that INN or a non-existent operating entity might have received from the operation of the Channel. Further, the profitability of the Channel was highly uncertain when the Hilliards promised to fund the Interim Agreement. Nor did they exercise "near exclusive control" over the profitability of the venture. In light of "the nature, purpose and particular circumstances of the contract known by the parties," by orally promising to provide up to $20 million to fund the Interim Agreement, the Hilliards cannot "be supposed to have assumed" liability for approximately $269 million in lost profits that might have been garnered in the future by a non-existent operating entity. *Kenford II*, 73 N.Y.2d at 319, 537 N.E.2d at 179, 540 N.Y.S.2d at 4.

\* \* \*

For all the foregoing reasons, we affirm the district court's grant of summary judgment dismissing all claims insofar as they seek damages for lost profits.

## II. Lost Asset Damages

### A. Distinction Between Damages for the Market Value of a Lost Income–Producing Asset and Lost Profits that Could Have Been Derived Therefrom

Schonfeld faults the district court for: (1) failing to distinguish his claims for the market value of the lost supply agreements from his request for lost profits; and (2) dismissing his lost asset claims. Schonfeld is correct.

In an action for breach of contract, a plaintiff may seek two distinct categories of damages: (1) "general" or "market" damages; and (2) "special" or "consequential" damages. *See* 3 Dan B. Dobbs, *Dobbs Law of Remedies* § 12.2(3) (1993). A plaintiff is seeking general damages when he tries to recover "the value of the very performance promised." *Id.* General damages are sometimes called "market" damages because, when the promised performance is the delivery of goods, such damages are measured by the difference between the contract price and the market

value of the goods at the time of the breach. *See id.* at § 12.4.

■ "Special" or "consequential" damages, on the other hand, seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach. *See id.* at § 12.2(3). The type of consequential damages most often sought is lost operating profits of a business. *See id.* However, lost profits are not the only kind of consequential damages. A defendant's breach of contract may also cause a plaintiff to lose an asset that was in its possession prior to the breach. *See id.* at §§ 12.4(1) and 12.4(4). In some instances, the asset lost is an *income-producing* asset, the fair market value of which may be based, in whole or in part, on a buyer's projections of what income he could derive from the asset in the future. *See Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 496 (2d Cir.1995); *Sharma v. Skaarup Ship Mgt. Corp.,* 916 F.2d 820, 825–26 (2d Cir.1990). Damages seeking to recover the market value for a lost income-producing asset have sometimes been referred to as "hybrid" damages. *See 3 Dobbs Law of Remedies* at § 12.2(3).

Although lost profits and "hybrid" lost asset damages are both consequential, rather than general, in nature, courts have universally recognized that they are separate and distinct categories of damages. *See Indu Craft,* 47 F.3d at 496; *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 416, 420 n. 3 (S.D.N.Y.1999) (recognizing distinction but rejecting market value theory on ground that it was not introduced until six days before trial).

■ When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach—not the lost profits that the asset could have produced in the future. *See Sharma,* 916 F.2d at

825; 1 *Dobbs Law of Remedies* at § 3.3(7) (Market value damages are "based on future profits as estimated by potential buyers who form the 'market'" and "reflect the buyer's discount for the fact that the profits would be postponed and ... uncertain.").

Applying these principles to Schonfeld's claims, it is clear that he is seeking two separate and distinct categories of consequential damages: (1) lost profits; and (2) "hybrid" damages for the market value of a lost income-producing asset. As we have already noted, *supra,* Schonfeld cannot recover the consequential damages he seeks for lost profits. However, this holding in no way impairs his ability to establish his claim for "hybrid" damages seeking the market value of the lost supply agreements. *See Indu Craft,* 47 F.3d at 495–96 (damages for market value of business are recoverable even though plaintiff's lost profits claim was too speculative).

Relying on *Kenford I,* the district court held that Schonfeld's lost asset claims were indistinguishable from DSI's claims for profits that it could have earned under the stadium management contract. The court's reliance on *Kenford I,* however, was misplaced. In *Kenford I,* DSI never sought to recover damages for the market value of the management agreement— damages that in that instance would have been general damages because the very performance promised was the execution of the agreement. For whatever reason, the only damages sought by DSI were consequential damages for lost profits. Thus, *Kenford I* does not stand as a bar to Schonfeld's seeking to recover the market value of the supply agreements.

We therefore turn to the proof necessary to recover "hybrid" consequential damages measured by the market value of a lost income-producing asset.

### B. *Proof Requirements for "Hybrid" Consequential Damages*

■ Some of the confusion in this area is traceable to the law of evidence. The

same kind of market-value proof is sometimes required to prove general damages as to prove "hybrid" damages for the loss of an income-producing asset. But the two remain analytically distinct. *See* 3 *Dobbs Law of Remedies* at §§ 12.2(3), 12.4(7). Like lost profits, "hybrid" damages are one step removed from the naked performance promised by the defendant; and their existence and extent depend on the individual circumstances of the plaintiff. *See id.* at §§ 12.2(3) and 12.4(5). Therefore, as with all consequential damages, a plaintiff must prove that liability for the loss of the asset was within the contemplation of the parties at the time the contract was made, and the asset's value should be proven with reasonable certainty. *See Indu Craft,* 47 F.3d at 496.

The market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time. It represents what a buyer is willing to pay for *the chance* to earn the speculative profits. Therefore, it is appropriate to apply these proof requirements more leniently than is the case with proof of lost profits. *See* 3 *Dobbs Law of Remedies* at § 12.2(3).

### 1. *Contemplation of the Parties*

■ Although not expressly stated by Russ Hilliard at the time the oral promise to fund the Interim Agreement was made, the Hilliards' liability for the loss of both the Interim and December Supply Agreements was clearly within the contemplation of all the parties. *See Ashland Mgt.,* 82 N.Y.2d at 403, 624 N.E.2d at 1010, 604 N.Y.S.2d at 915. Indeed, Schonfeld introduced Russ Hilliard's own testimony acknowledging that the BBC would not have agreed to enter into the Interim and December Supply Agreements had the Hilliards not promised to fund the Interim Agreement.

**2.** Properly parsed, Schonfeld seeks to recover the market value of the lost December Supply Agreement in connection with his breach of contract, promissory estoppel, breach of fidu-

Thus, the only remaining issues with respect to Schonfeld's claims for lost asset damages are whether he can establish both their existence and their amount with reasonable certainty.

### 2. *Certainty of Lost Asset Damages*

Schonfeld correctly argues that the district court erred in holding that: (1) he failed to establish that the March and December Supply Agreements were valuable, "recoverable" assets; and (2) even if they were, he could not establish their market values with reasonable certainty.

#### a. *"Recoverable" Assets*

■ The goal of awarding damages for the market value of a lost asset is "to make sure the defendant's tort or contract breach does not leave the plaintiff with assets or net worth less than that to which she is entitled." 1 *Dobbs Law of Remedies* at § 3.3(3). Therefore, so long as the lost asset has a determinable market value, a plaintiff may seek to recover that value whether the asset is "tangible or intangible property or almost any kind of contract right." *Id.* A supply contract, for instance, is a form of intangible property that has an ascertainable value. *See* 87 N.Y. Jur.2d *Property* § 3 (1990); *Ambrose v. Commissioner,* 15 T.C.M. (CCH) 643 (1956) (valuation of wine supply agreement as a corporate asset); *see also Bailey v. Commissioner,* 993 F.2d 288 (2d Cir.1993) (valuation of partnership's contract rights to receive film royalties).

■ It is undisputed that the March and December Supply Agreements, wherein the BBC granted INN a 20–year exclusive programming license, were INN's most valuable assets.[2] Indeed, Russ Hilliard and Bruce Dickenson of Daniels testified that, other than the cash in its bank account, the supply agreements were the *only* valuable assets that INN possessed.

ciary duty and corporate waste and mismanagement claims. He seeks to recover the market value of the March Supply Agreement in connection with his fraud claim.

Russ Hilliard also conceded that: (1) Schonfeld and the BBC would not have agreed to abandon the March Supply Agreement and enter into the Interim and December Supply Agreements had the Hilliards not promised to fund the Interim Agreement; and (2) INN lost the December Supply Agreement, in part, as a result of the Hilliards' failure to fund. We conclude that Schonfeld has established the existence of lost asset damages with the requisite certainty.

**b.  Competent Evidence of Market Value**

■ When a defendant's breach of contract deprives a plaintiff of an asset, the courts look to compensate the plaintiff for the "market value" of the asset "in contradistinction to any peculiar value the object in question may have had to the owner." John D. Calamari and Joseph M. Perillo, *The Law of Contracts* § 14–12 (3d ed.1987). Although it is easier to determine an asset's market value when it is actively traded on a standardized exchange or commodities market, an asset does not lose its value simply because no such market exists. *See id.* Admittedly, in such instances, "the determination of a market value involves something of a fiction." *Id.;* see *American Soc'y of Composers, Authors and Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990) (hereinafter *"ASCAP"*); 1 *Dobbs Law of Remedies* at § 3.5 (market value "is not an existing fact but a legal construct or even a convention"); Charles T. McCormick, *Handbook on the Law of Damages* § 44 (1935) (without a standardized market, " 'market value' becomes an inference as to the action of an imaginary purchaser.").

■ In determining the market value of unique or intangible assets, New York courts have embraced the hypothetical market standard enunciated by the Supreme Court in *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973): "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *See, e.g., Nestle Holdings, Inc. v. Commissioner*, 152 F.3d 83, 88 (2d Cir. 1998) (trademark); *ASCAP*, 912 F.2d at 569 (music license); *W.T. Grant Co. v. Srogi*, 52 N.Y.2d 496, 420 N.E.2d 953, 438 N.Y.S.2d 761 (1981): *See also* 1 *Dobbs Law of Remedies* at § 3.5; Calamari and Perillo, *The Law of Contracts* at § 14–12.

■ If no prior sales history is available, experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced. *See ASCAP*, 912 F.2d at 569–71 (music license); *Robbins v. Frank Cooper Assocs.*, 14 N.Y.2d 913, 200 N.E.2d 860, 252 N.Y.S.2d 318 (1964) (television show format); *Central Dover Dev. Corp. v. Town of Dover*, 255 A.D.2d 542, 680 N.Y.S.2d 668, 669 (2d Dep't 1998) (mineral rights); *Gilroy v. American Broad. Co.*, 47 A.D.2d 728, 728, 365 N.Y.S.2d 193, 194 (1st Dep't 1975) (literary character); 58 N.Y. Jur.2d *Evid.* § 695 (1986); Calamari and Perillo, *The Law of Contracts* at § 14–13.

■ If he is sufficiently qualified, even an asset's owner may testify as to its market value. *See Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 647 (2d Cir.1989) (fifty percent shareholder of plaintiff corporation testified regarding market value damages in action for breach of film licensing contract); *Chamberlain v. Dunlop*, 126 N.Y. 45, 53, 26 N.E. 966, 967 (1891); *Gilroy*, 47 A.D.2d at 728, 365 N.Y.S.2d at 194.

■ If, fortunately, the asset at issue has a sales history, then despite the lack of a traditional market, it is easier for the court to determine the asset's market value as of the time it was lost. Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the "best evidence" of its market value. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 741–42,

117 S.Ct. 1659, 137 L.Ed.2d 980 (1997); *accord Silverman v. Commissioner*, 538 F.2d 927, 932 n. 7 (2d Cir.1976); *W.T. Grant Co.*, 52 N.Y.2d at 511, 420 N.E.2d at 960, 438 N.Y.S.2d at 768; *see also Grill v. United States*, 157 Ct.Cl. 804, 303 F.2d 922, 927 (Ct.Cl.1962) (distribution rights to the film "Gone with the Wind").

Once a plaintiff has produced such evidence, the burden is on the defendant to demonstrate "special circumstances which would negate [the relevance] of a prior arm's-length purchase price." *Shapiro v. State*, 61 A.D.2d 852, 853, 401 N.Y.S.2d 921, 922 (3d Dep't 1978); *see Plaza Hotel Assocs. v. Wellington Assocs., Inc.*, 37 N.Y.2d 273, 278, 333 N.E.2d 346, 349, 372 N.Y.S.2d 35, 40 (1975) (price agreed upon in arm's-length transaction "should be accorded significance of the highest rank as a determiner of the value of the property, unless explained away as abnormal in some fashion").

■ Although the "sale price rule" is usually seen only in the context of completed transactions, the price at which a party offered to sell the subject property in an unsuccessful transaction nevertheless may be introduced as a party admission when offered against that party. *See McAnarney v. Newark Fire Ins. Co.*, 247 N.Y. 176, 178, 186, 159 N.E. 902, 903, 905 (1928); *Hewitt v. State*, 37 Misc.2d 634, 637, 235 N.Y.S.2d 481, 484 (Ct.Cl.1962); *Petition of Union Free Sch. Dist. No. 3 of Town of Huntington, County of Suffolk*, 225 N.Y.S.2d 430, 432 (Sup.Ct.1962), *aff'd*, 19 A.D.2d 859, 245 N.Y.S.2d 993 (2d Dep't 1963); 57 N.Y. Jur.2d *Evid.* §§ 235, 294 (1986); Calamari and Perillo, *The Law of Contracts* at § 14–13 (applying rule in breach of contract actions).

■ Furthermore, if the sale price offered as evidence against the defendant by the plaintiff is contained in a contract that was negotiated by the parties at arm's length, it remains admissible even though the transaction contemplated by the contract was never completed if: (1) the performance promised is not yet due under the contract and the parties still intend to perform, *see Garland Properties, Inc. v. Assessor of City of Elmira*, 40 A.D.2d 566, 567, 334 N.Y.S.2d 52, 53 (3d Dep't 1972); or (2) the transaction contemplated under the contract would have occurred but for the defendant's actions or the interference of a third-party. *See Novack v. State*, 61 A.D.2d 288, 292, 402 N.Y.S.2d 457, 460 (3d Dep't 1978); 57 N.Y. Jur.2d *Evid.* § 232 (1986).

■ Schonfeld is attempting to establish the market value of INN's 20–year exclusive BBC programming license which was embodied in both the March and December Supply Agreements. The market for these assets comprises all U.S. cable operators. However, because there is no standardized market or exchange where INN could have sold its contract rights, their market value must be determined by using the hypothetical sale construct. Therefore, the district court erred to the extent that it based its decisions to dismiss claims and to exclude evidence in the court's belief that: (1) no real market exists for the sale of BBC programming rights; and (2) any alleged value would be "based on a hypothetical resale" of the programming rights to a third party whose valuations would be "highly dependent on the unique characteristics of the hypothetical buyer." *Schonfeld*, 62 F.Supp.2d at 1080, 1081.

As evidence of the market value of the supply agreements, Schonfeld relied on the purchase price set in the Cox Agreement. He also introduced expert testimony regarding the value of the 5% equity portion of the purchase price. Schonfeld argues that the district court erred by: (1) holding that the Cox Agreement is insufficient evidence of market value because it was contingent on BBC approval, never final, and based in part on revenue projections that were "unique to Cox;" and (2) excluding the expert testimony offered as to the value established by the Cox Agreement.

180

The Hilliards contend that the district court was right. In addition, they argue that the Cox Agreement should be disregarded as abnormal because the supply agreements contained numerous limitations and obligations (*i.e.*, INN had to obtain its own investment capital, carriage and advertising agreements and the agreement would expire within one year if certain investment and distribution levels were not reached) with no guaranteed revenue stream. We disagree.

### (i) Curtis's Expert Testimony

■ We review the district court's decision to exclude expert testimony for an abuse of discretion, mindful that a mistake of law is automatically such an abuse. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir.1999).

■ The district court excluded all expert testimony proffered by Schonfeld in support of his claims for lost asset damages on the grounds that it was "irrelevant and speculative." It was irrelevant, said the court, because Schonfeld had failed to establish that the supply agreements were even "recoverable assets." This holding, as previously held, was based on an error of law. In addition, Schonfeld is entitled to offer expert testimony as to the value of an income-producing asset, notwithstanding that it rests, in part, on the asset's ability to produce profits in the future. *See ASCAP*, 912 F.2d at 569–71; Calamari and Perillo, *The Law of Contracts* at § 14–13.

Accordingly, we hold that the district court improperly excluded Curtis's expert testimony with regard to the market value of the supply agreements.

### (ii) Admissibility of the Cox Agreement

■ We also conclude that the Cox Agreement is competent evidence of the market values of the March and December Supply Agreements. Indeed, using the Cox Agreement as a benchmark, Schonfeld will likely be able to establish their market values with reasonable certainty on remand.

First, it is undisputed that the Cox Agreement was negotiated at arm's length and that Cox is a well-informed leader in the cable television industry. Although the Hilliards prefer to refer to the agreement reached with Cox as "the Cox offer," Cox's offer to purchase INN's programming rights was memorialized in a contract dated June 2, 1994, that was signed by INN. Further, the Cox Agreement established a price at which Cox agreed to buy and, more importantly, INN agreed to sell INN's programming rights under the March Supply Agreement. Therefore, Schonfeld offered what we consider "the best evidence" of the market value of the March Supply Agreement. *Silverman*, 538 F.2d at 932.

It is true that the sale anticipated by the Cox Agreement never occurred and was "subject to the BBC not voicing objections," the approval of Cox's board of directors, and the receipt of a non-binding letter of its intent to invest from TCI Cable. However, Schonfeld introduced evidence that the conditions could have been met, and the deal could have gone through, had the Hilliards agreed to grant an extension of time to work out the few remaining issues. Therefore, the district court should have "placed considerable weight" on the Cox Agreement as evidence of the value of the March Supply Agreement. *Garland Properties, Inc.*, 40 A.D.2d at 567, 334 N.Y.S.2d at 53 (where satisfaction of contingencies in the contract "created no serious problem," the court properly "allow[ed] proof of the facts and circumstances of the prospective sale, ... [and placed] considerable weight thereon as evidence of the value of the property"); *see also Novack*, 61 A.D.2d at 292, 402 N.Y.S.2d at 460; 57 N.Y. Jur.2d *Evid.* § 232 (1986).

■ Even if the deal with Cox would not have gone through had the Hilliards

granted Cox the extension of time, the Cox Agreement clearly establishes the price at which the Hilliards were willing to sell their rights under the March Supply Agreement. Therefore, under the rules of evidence, the price set forth in the Cox Agreement is admissible against the Hilliards as a party admission. *See McAnarney,* 247 N.Y. at 178, 186, 159 N.E. at 903, 905; *Hewitt,* 37 Misc.2d at 637, 235 N.Y.S.2d at 484; *Petition of Union Free Sch. Dist.,* 225 N.Y.S.2d at 432; 57 N.Y. Jur.2d *Evid.* §§ 235, 294; Calamari and Perillo, *The Law of Contracts* at § 14–13.

The Hilliards argue that the purchase price contained in the Cox Agreement should be disregarded as "unique to Cox" because Cox had an established cable network and a pre-existing relationship with the BBC. They contend that the supply agreements would not have the same value to any other purchaser because of their complexity and the substantial limitations and obligations, both financial and promotional, contained therein. This argument is unpersuasive and contrary to New York law.

In *Plaza Hotel Assocs.,* the defendant had previously paid $3.6 million to buy an option to purchase a one-half undivided interest in the land under the Plaza Hotel. In determining the value of the land, the trial court disregarded the price established by the arm's-length option purchase because "the nature of the transaction and the varied interests of the parties were so unusual that the purchase price could not be relied upon and ... even the option itself was not ordinary." *Id.,* 37 N.Y.2d at 277–78, 333 N.E.2d at 349–50, 372 N.Y.S.2d at 39–40. Rejecting the argument (identical to that made by the Hilliards), the Court of Appeals affirmed the Appellate Division's reversal of the trial court. The Court held that, "[d]espite the seemingly complicated terms of the agreements, ... we do not share the belief that the complexities were so unusual as to take the case outside the scope of the general rule" that a purchase price set in the course of an arm's-length transaction is evidence of the highest rank to determine property value. *Id.*

Cox's resources and business position are not determinative of whether the Cox Agreement is competent evidence of the market value of the supply agreements. Any offer is *by definition* unique to the purchaser because the value of an asset to the purchaser depends on the purchaser's needs, resources and circumstances. The value placed on an asset by a purchaser, however, does not become evidence of the asset's market value unless it is also the price at which a reasonably informed seller is willing to sell the asset. Here, Cox "was obviously aware of the conditions and restriction found [in the March Supply Agreement], but nonetheless it agreed upon a price that it thought reasonable under the circumstances." *Id.* Further, it was a price at which INN was willing to sell its rights.

Based on the Court of Appeals' definition of market value, it does not matter that the BBC's total package deal with Cox (or any other buyer for that matter) would materially differ from the BBC's deal with INN. Every cable operator has a unique cost structure, revenue flow and relationship with the BBC. *Absent an agreed upon sales price,* an expert would have to testify as to: (1) all the relevant factors that a cable operator would consider in determining what to offer INN for its contract rights (such as the terms of the purchaser's possible deal with the BBC); and (2) the factors that INN would consider in deciding at what price to sell. But here, we are fortunate to *have an agreed upon sales price* which, under New York law, is competent evidence of market value despite the complex nature of the transaction.

Finally, the Hilliards argue that, even if the Cox Agreement is competent evidence of the market value of the March Supply Agreement, it is not admissible to establish the market value of the December Supply Agreement because of material

differences in the terms. However, evidence of sale prices negotiated at arm's length for the purchase of "comparable" property is admissible as evidence of the market value of the property at issue. *See ASCAP,* 912 F.2d at 569–71; Calamari and Perillo, *The Law of Contracts* at § 14–13.

■ Moreover, the price set forth in the Cox Agreement was what Cox was willing to pay to ensure that INN could not compete with its BBC news channel for twenty years. The 20–year right to exclusive programming remained constant despite the financial changes in the two agreements. Therefore, the Cox Agreement is still relevant and competent evidence of the market value of the December Supply Agreement. *See ASCAP,* 912 F.2d at 570–71 (holding that although "courts do not permit psychoanalysis of buyers in comparable transactions to explore the complex mental processes that affected their decision finally to agree on a price," the district court properly admitted evidence of buyer intent to evaluate the weight to be afforded evidence of comparable sales). The changes in the agreements were not "so drastic that the value of the [December Supply Agreement] could not be ascertained by taking the original purchase price and adjusting it." *Shapiro,* 61 A.D.2d at 853, 401 N.Y.S.2d at 922. It is for the jury to decide what effect the change in terms would have had on the Cox Agreement, and Schonfeld should be able to introduce expert testimony on this issue.

### c. *The Value Established by the Cox Agreement*

The only remaining issue is whether the market values for the March and December Supply Agreements can be established with reasonable certainty using the Cox Agreement as a benchmark. Or simply put, what was the purchase price that INN agreed to accept in the Cox Agreement? The agreement provided that the total purchase price would be paid as follows: (1) $700,000 cash upon the signing of the

definitive agreements required by the Cox Agreement; (2) $1 million (in annual installments $100,000) paid over ten years; and (3) a 5% equity interest in Cox's two BBC channels.

The district court held that, "[a]lthough the offer proposed an up-front payment, most of INN's compensation was contingent on the revenue generated by the two proposed channels in the tenth year of operations" and such revenue forecasts are "insufficient to prove damages with reasonable certainty." *Schonfeld,* 62 F.Supp.2d at 1080. Ultimately, the district court "excluded as irrelevant and speculative" all expert testimony proffered in support of Schonfeld's claims for lost asset damages and dismissed all claims insofar as they sought to recover such damages. *See id.* at 1081. In so holding, the district court applied an improper "all or nothing" approach with respect to the Cox Agreement, *i.e.,* if the *entire* purchase price established by the Cox Agreement cannot be determined with reasonable certainty, then Schonfeld cannot establish the market value of the supply agreements.

However, if he can successfully establish the Hilliards' liability, Schonfeld is entitled, as a matter of law, to recover market value damages *to the extent* that they can be proven with reasonable certainty. Further, pursuant to the "wrongdoer rule," where, as here, "the existence of damage is certain, and the only uncertainty is as to its amount, ... the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Contemporary Mission, Inc.,* 557 F.2d at 926. Therefore, the burden of uncertainty here is upon the Hilliards. *See Indu Craft,* 47 F.3d at 496 (applying wrongdoer rule to plaintiff's claim for market value of lost ongoing business as consequential damages).

■ In light of the Cox Agreement, a reasonable jury could find that INN's programming rights were worth at least $700,000 plus the present value of $1 million paid over ten years, for a total of

approximately $1.39 million.[3] In addition, the Cox Agreement provides sufficient information to calculate a dollar value for the 5% equity portion of the purchase price. Cox retained the right to buy out INN's 5% interest in the tenth year of operations at a price of 20% of the tenth-year gross revenues of both channels. Incorporated into the Cox Agreement by reference are revenue projections for the news channel made by Cox that were previously forwarded to INN.[4] Therefore, on remand, Schonfeld ought to be able to establish, with reasonable certainty, the total amount that Cox was willing to pay and INN was willing to accept for the March Supply Agreement on June 2, 1994.

Using the purchase price contained in the Cox Agreement as a benchmark, Schonfeld may introduce expert testimony on remand as to the market values of the March and December Supply Agreements as of the dates on which they were caused to be abandoned or lost. The Hilliards, of course, may introduce evidence with respect to the *weight* to be accorded the Cox Agreement and may offer independent evidence with respect to the market values of the March and December Supply Agreements.

*　　*　　*

■ For the foregoing reasons, the district court erred when it: (1) excluded the expert testimony offered in support of Schonfeld's claims for market value damages; and (2) granted summary judgment dismissing Schonfeld's claims insofar as they sought to recover the market value of the December Supply Agreement. In addition, to the extent that Schonfeld seeks to recover the market value of the March Supply Agreement in connection with his fraud claim, that claim was improperly limited to $15,000. "Under New York law,

the measure of damages for fraud is governed by the 'out-of-pocket' rule which permits recovery for a plaintiff's reliance interest," including damages incurred by "passing up other business opportunities." *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 793 n. 6 (2d Cir.1986) (internal quotation marks and citations omitted). Therefore, Schonfeld may seek to recover the market value of the March Supply Agreement which INN abandoned in reliance on the Hilliards' promises. *See id.*, 787 F.2d at 793 (noting that fraud claims are properly alleged, and are not merely contract claims in disguise when "the injury alleged [i]s the detriment actually suffered by the plaintiff rather than the value of what defendant promised").

### III. *Punitive Damages*

Schonfeld argues that the district court erred by dismissing his claims for punitive damages in connection with his fraud and breach of fiduciary duty causes of action on the ground that Schonfeld failed to establish that the defendant's conduct caused public harm. Even if Schonfeld is correct regarding the public harm requirement, we affirm the district court's dismissal of Schonfeld's claims insofar as they seek punitive damages.

In *Rocanova v. Equitable Life Assurance Soc'y of the United States*, 83 N.Y.2d 603, 634 N.E.2d 940, 612 N.Y.S.2d 339 (1994), the Court of Appeals held that, in order to recover punitive damages for breach of contract, a plaintiff must establish that the defendant's conduct: (1) is actionable as an independent tort; (2) was sufficiently egregious; and (3) was directed not only against the plaintiff, but was part of a pattern of behavior aimed at the public generally. *See id.*, 83 N.Y.2d at

---

**3.** Curtis calculated the present value of $1 million paid over ten years to be $687,000.

**4.** The district court acknowledged that certain aspects of the Cox projections "arguably render them more certain than the INN forecast." *Schonfeld*, 62 F.Supp.2d at 1080. For

instance, "Cox has a record of expenses, an established management and a ready distribution system for new programming" and revenues only had to be projected ten (rather than twenty) years into the future. *Id.*

613, 634 N.E.2d at 944, 612 N.Y.S.2d at 343. The Court of Appeals has since suggested that these requirements are applicable whenever an action "has its genesis in the contractual relationship between the parties." *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316, 662 N.E.2d 763, 767, 639 N.Y.S.2d 283, 287 (1995).

Relying on pre-*Rocanova* cases, Schonfeld argues that the public harm requirement is not applicable to claims for fraud or breach of fiduciary duty. *See, e.g., Giblin v. Murphy*, 73 N.Y.2d 769, 536 N.Y.S.2d 54, 532 N.E.2d 1282 (1988) (punitive damages properly awarded in action for breach of contract and fraud despite absence of public harm where defendant recklessly and repeatedly breached their fiduciary duties and conducted an "out-and-out fraud"); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir.1991) (holding in action for fraud, breach of fiduciary duty, breach of contract and unjust enrichment that, "[u]nder New York law, punitive damages are appropriate in cases involving gross, wanton or willful fraud or other morally culpable conduct ... [which] need not be directed at the general public") (internal quotation marks and citations omitted).

█ We need not decide whether the "public harm" requirement set forth in *Rocanova* applies to claims for fraud or breach of fiduciary duty, however, because we agree with the district court that the defendants' alleged conduct was not "sufficiently egregious" or "willful" to warrant the imposition of exemplary damages even under the standards applicable to ordinary fraud claims. Nor is there evidence of self-dealing or malicious conduct. Indeed, as a result of the dissolution of the Interim and December Supply Agreements, the Hilliards collectively lost almost $800,000. Accordingly, we affirm the district court's dismissal of Schonfeld's claims for fraud and breach of fiduciary duty insofar as they seek punitive damages.

## IV. *Defendants' Additional Arguments on Appeal*

The Hilliards argue that we should nevertheless affirm the district court's grant of summary judgment because the oral promise to fund is unenforceable. The bases for this contention are twofold: (1) the alleged promise was so indefinite that there could not have been a "meeting of the minds;" and (2) the promise is not in writing as is necessary to modify the Shareholders' Agreement and is also required by the New York Statute of Frauds.

█ Both of these grounds were briefed by the parties below, but the district court elected not to address them. Although we are empowered to affirm a district court's decision on a theory not considered below, it is our distinctly preferred practice to remand such issues for consideration by the district court in the first instance. This is particularly appropriate when, as here, such theories have been briefed and argued only cursorily in this Court. *See Thompson v. County of Franklin*, 15 F.3d 245, 253 (2d Cir.1994). We therefore remand to allow the district court to consider these arguments in the first instance.

## CONCLUSION

We have considered the parties' remaining contentions and find them to be without merit. Accordingly, we AFFIRM the grant of the appellees' motion for summary judgment dismissing appellant's claims insofar as they seek damages for lost profits and punitive damages, REVERSE the grant of the appellees' motion for summary judgment dismissing appellant's claims insofar as they seek damages for the market value of the supply agreements and limiting appellant's fraud claim to $15,000, VACATE the judgment entered below dismissing Counts II through X of the Amended Complaint and RE-

MAND for further proceedings consistent with this opinion.