**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 10, 2004**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 03-50419
_____

FLUORINE ON CALL LTD

Plaintiff - Counter Defendant - Appellee - Appellant

v.

FLUOROGAS LIMITED, ET AL.

Defendants

FLUOROGAS LIMITED

Defendant - Counter Claimant - Appellant - Appellee

and

THE BOC GROUP, INC; THE BOC GROUP PLC

Defendants - Appellants - Appellees

v.

FREDERICK J SIEGELE; STEPHEN SIEGELE

Third Party Defendants - Counter Defendants - Appellees

and

APPLIED MATERIALS INC

Third Party Plaintiff - Appellee

--------------------
Appeals from the United States District Court
for the Western District of Texas
--------------------

Before DAVIS, PRADO and PICKERING, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This case arises from a "Memorandum of Understanding"

1

between Fluorogas Limited ("Fluorogas") and Fluorine on Call, Ltd. ("FOC"). Flourogas is a small English company that develops and manufactures fluorine generators. It was owned by Graham Hodgson, who was also its president. FOC is a Texas company that began with two brothers, Frederick and Stephen Siegele. The Siegeles sought to enter what they viewed as the potential market for on-site fluorine generators for use in the semiconductor industry.

This potential market arises from the need to clean manufacturing equipment. Some of the equipment used in the semiconductor manufacturing process involves "chemical vapor deposition," also called CVD. The process involves spraying chemicals onto silicon wafers while those wafers are inside a chamber. Over time, this chamber becomes contaminated and needs cleaning. Generally, chambers are cleaned with nitrogen trifluoride (or $NF_3$) gas, which presents certain environmental hazards and can be expensive. Because of these problems, companies have looked for alternatives to $NF_3$. One of these potential alternatives is fluorine gas (or $F_2$). Yet Fluorine has its own problems – in particular, it is extremely dangerous and difficult to handle.

Fluorogas manufactures fluorine generators for other uses. Using Fluorogas's technology for the semiconductor manufacturing process would require, as even the Siegeles have admitted, a "quantum leap in technology." Fluorogas discussed the

2

possibility of providing generators for semiconductor manufacturing with some other companies, but those discussions did not lead to anything concrete. Nevertheless, one of the other companies provided Applied Materials ("Applied") with a quote for fluorine generators based on Fluorogas's technology.

After examining the potential market for on-site fluorine generators as well as potential sources, the Siegeles contacted Fluorogas. Interested in obtaining a license to Fluorogas's technology, the Siegeles began negotiating with Hodgson in the summer of 2000. Eventually, these negotiations led to a Memorandum of Understanding ("MOU"), which Hodgson and Frederick Siegele signed in a country club in the Florida Keys on August 11, 2000. The MOU was a handwritten document drafted by Frederick Siegele over the course of a weekend. Fluorogas contends that the parties planned to eventually replace the MOU with a more formal contract; in September 2000, Frederick Siegele wrote a letter agreeing with that contention.

The MOU granted FOC "the exclusive worldwide right to manufacture and supply Fluorine generators based on FG Background Technology (as defined below) where such generators are to be used in the Chemical Vapor Deposition ("CVD") process, excluding etch applications." In return, FOC agreed to pay royalties based on its revenues; if FOC failed to make those royalty payments, its license would become non-exclusive once Fluorogas provided notice. Fluorogas also granted FOC some non-exclusive rights to

3

Fluorogas's technology: "the non-exclusive worldwide right to manufacture and supply Fluorine generators based on FG Background Technology where such generators are to be used in the Semiconductor Industry, including the etch applications." The MOU contained no express duration term.

After the parties signed the MOU, FOC purchased a Fluorogas test generator to sell to Applied. According to Applied, it could not use this test generator for its business; rather, it used the generator to assist in determining whether on-site fluorine generation might be commercially viable.

Sometime thereafter, Applied employees had various conversations directly with Fluorogas. Although the nature of the conversations is somewhat disputed, it appears that these conversations involved, at least, the possibility of Applied investing in Fluorogas.[1] FOC contends that the discussions also suggested that Applied deal directly with Fluorogas.[2] FOC contended that these conversations violated the MOU and so sued Fluorogas. In January 2001, FOC dismissed this first suit without prejudice.

On February 23, 2001, Fluorogas's lawyers sent FOC a letter, which forms the basis of much of this case. After first stating

[1]Fluorogas and FOC disagree about whether they discussed an investment during the initial negotiations.

[2]Around the same time, Applied discussed purchasing another generator from FOC, but these discussions went nowhere.

4

that it was not sure that the MOU bound it, Fluorogas stated:

> For the avoidance of any possible doubt we must make it clear that this letter is formal notice of termination of the relationship sought to be realised under the Memorandum of Understanding, and accordingly, and to the extent that the Memorandum of Agreement imposed any obligation on our client, any and all such obligations are now at an end.

After receiving this letter, FOC sued Fluorogas again in Texas state court on March 8, 2001; Fluorogas removed the case, based on diversity, to the Western District of Texas.  FOC later added Applied as a defendant, bringing claims for tortious interference with contract and conspiracy against it.

In September 2001, while this case was pending, The BOC Group plc, a publicly-held British company, purchased all of Fluorogas's stock for $4.5 million, plus contingent money depending on sales of fluorine generators.  The BOC Group (through BOC Edwards, a division of BOC Group's American subsidiary) first contacted Fluorogas on March 2, 2001, seven days after Fluorogas terminated the MOU.[3]  The purpose of this contact was to discuss working together to develop fluorine generators for on-site CVD cleaning.  On September 26, 2001, The BOC Group plc purchased all of Fluorogas's stock.  Fluorogas

---

[3]At various points FOC disputes this, but presents no evidence that the first contact occurred before the termination letter.  Its only evidence is that someone's original deposition testimony had an incorrect date and an argument that the contact in early March was suspicious.  BOC began discussing on-site fluorine generators with Applied in January 2001, but all the evidence indicates that Applied suggested that BOC use 3M's technology, not Fluorogas's.

continues to sell fluorine generators for work unrelated to semiconductor use and sells fluorine cells to BOC Edwards for BOC Edwards to develop for semiconductor use. BOC has yet to make a profit from semiconductor fluorine use, having only placed two test units with customers. After this acquisition, FOC amended its complaint to add claims for tortious interference, conspiracy, and derivative liability against The BOC Group plc and its American subsidiary, The BOC Group, Inc. (collectively "BOC").

On December 16, 2002, following referral to a magistrate judge, the district court granted summary judgment in Applied's favor on all of FOC's claims against it. The district court also granted summary judgment in BOC's favor on the tortious interference and conspiracy claims.

The remaining claims went to trial, where the jury found for FOC on its breach of contract and fraud claims against Fluorogas and also found BOC derivatively liable. The jury awarded $120,000,000 for "loss of income producing asset" damages, $170,000 in reliance damages, and $12 million in punitive damages. The district court entered judgment for these awards, plus prejudgment interest, costs, and $24,199,037.45 in attorney's fees. Thus, the total judgment exceeded $170 million. Fluorogas and BOC moved for judgment as a matter of law, for a new trial, and for remittitur. The district court denied these motions. Fluorogas, BOC, and FOC filed notices of appeal.

6

**Fluorogas's and BOC's Appeal**

**Standard of Review**

Fluorogas and BOC appeal the district court's denial of their motions for judgment as a matter of law, a decision we review *de novo*. *Arguello v. Conoco, Inc.*, 330 F.3d 355, 357 (5th Cir. 2003). In a jury case, a motion for judgment as a matter of law challenges the sufficiency of the evidence supporting the verdict. *Id*. To review the sufficiency, we consider the entire trial record in the light most favorable to the nonmovant, drawing reasonable inferences in its favor. *Id.* "An issue is properly submitted to the jury where there is a conflict in substantial evidence – 'evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" *Id.* at 357-58 (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc)).

**Was the MOU Terminable At Will?**

Initially, Fluorogas contends that the MOU contained no duration term and therefore was terminable at will. The district court concluded that the MOU was terminable at will, but that it also contained an implied reasonable term. Thus, the district court instructed the jury that "the court has determined that although the MOU lacks a definite term of duration, it should,

7

nonetheless, be allowed to proceed for a reasonable amount of time.  You, the jury, must now determine from a preponderance of the evidence what was a reasonable term of duration for the MOU." The jury answered that the MOU contained a 5-year reasonable term and awarded damages for termination before that term had expired.

We have previously held that contracts with indefinite length are terminable at will:

> Under Texas law, when a contract "contemplate[s] continuing performance (or successive performances) and ... [is] indefinite in duration," it may be terminated at the will of either party.  Moreover, "this circuit ... does not favor perpetual contracts" and "presumes that [any such] contract is terminable at will."

*Trient Partners I, Ltd. v. Blockuster Entm't Corp.*, 83 F.3d 704, 708 (5th Cir. 1996)(citations omitted); *see also Clear Lake City Water Auth. v. Clear Lake Util. Co.*, 549 S.W.2d 385, 390 (Tex. 1977).  Although the contract in *Trient* specifically stated that it was indefinite in duration, the case did not suggest that this rule only applied to contracts with an express indefinite term. FOC cites no Texas cases to challenge this principle, but instead attempts to escape its reach.

Thus, while acknowledging this rule, FOC asserts that the MOU is not terminable at will.  Initially, FOC challenges the conclusion that the MOU lacks a duration term.  FOC argues that the contract is not indefinite because it continued in effect so long as FOC continued to pay royalties.  Conversely, FOC contends, the MOU terminated when FOC stopped paying those

8

royalties.  As support, FOC cites language from a Texas Supreme Court case, "[w]ords which fix an ascertainable fact or event, by which the terms of a contract's duration can be determined, make the contract definite and certain in that particular." *City of Big Spring v. Bd. of Control*, 404 S.W.2d 810, 815 (Tex. 1966). In *Big Spring*, the city contracted to provide water to a nearby state-run hospital at a certain rate; by its terms the agreement "continue[d] in full force and effect [a]nd [was] not subject to being revoked as long as the State of Texas shall in good faith maintain and operate said hospital." *Id*.  In light of this provision, the court concluded that the contract was not indefinite and thus not terminable at will.  *Id*.

Here, the MOU's language is not so conditional, providing: "If FOC fails to make such payment as disclosed in Table One, FOC's license upon [Flurogas] providing written notice to FOC, shall hereafter be non-exclusive."  This provision resembles a remedy, not a duration term.  We have reached similar conclusions in other cases.  For example, using the Iowa version of the U.C.C.,[4] we determined that a provision in an exclusive distribution contract permitting termination if either party defaulted did not remove it from the general rule that indefinite

---

[4]The *Delta* court noted that the relevant U.C.C. provision "is a codification of the common law rule that unless otherwise stated, a contract is terminable at will upon reasonable notice." *Delta Servs. & Equip. Co v. Ryko Mfg. Co.*, 908 F.2d 7, 10 (5th Cir. 1990).

contracts are terminable at will.  *Delta Servs. & Equip. Inc. v. Ryko Mfg. Co.*, 908 F.2d 7, 9 (5th Cir. 1990).[5]  The contract in *Trient*, too, contained terms providing that the contract terminated upon various forms of breach or default.  *Trient*, 83 F.3d at 709.  Yet *Trient*'s contract remained terminable at will.  *Id*.  There, the court held that the default and breach provisions "are not the kind of determinable events that transform a contract of indefinite duration into one of definite duration," in part because they simply state a fundamental principle of contract law: a material breach may terminate a contract.  *Id*.[6]

Additionally, despite FOC's attempts to universalize *Big Spring*, we have held that its holding is limited; the case involves specific problems of government entities providing governmental functions.  *Trient*, 83 F.3d at 710.  *Big Spring* "simply carves out an exception to the general rule of law

---

[5]The *Delta* court distinguished *Besco, Inc. v. Alpha Portland Cement Co.*, 619 F.2d 447 (5th Cir. 1980), where a contract expressly indicated that the right to terminate would be based solely on a failure to sell a certain amount of product or the unavailability of materials. *Delta*, 908 F.2d at 9.

[6]FOC's citation to *Rolling Lands Investments, L.C. v. Northwest Airport Management*, *L.P.*, 111 S.W.3d 187 (Tex. App. – Texarkana 2003, pet. denied), does not change this result. In *Rolling Lands*, an agreement for access rights to an airport ended when, among other things, the airport closed or its operations stopped.  *Id*. at 197.  This is distinguishable from the situation here, where one party could unilaterally terminate (or, rather, turn an exclusive right into an non-exclusive one) by not paying royalties.

governing indefinite duration contracts in Texas." *Id*. at 711.

FOC also analogizes the license to habendum clauses in oil and gas leases. Because habendum clauses, which define a mineral estate's duration, last indefinitely until a condition is reached, "a typical Texas lease that lasts 'as long as oil or gas is produced' automatically terminates if actual production permanently ceases during the secondary term." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). But habendum clauses exist in a distinguishable context and serve a different purpose: "[a] Texas mineral lease grants a fee simple determinable to the lessee. Consequently, the lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose." *Id*. (citations omitted). FOC's exclusive license differs significantly from a fee simple in a mineral estate, and FOC has not cited any case outside the oil-and-gas context where habendum clause principles have been applied or where analogies to habendum clauses have been drawn. We, too, decline to draw such an analogy.

Finally, FOC cites *University Computing Co. v. Leader Corp*., 371 F. Supp. 86 (N.D. Tex. 1974). In *Leader*, the parties entered into a settlement agreement that contained various obligations of definite duration. The agreement also provided, in three different places, that one party (Leader) could use the other party's software "for an indefinite period of time." *Id*. at 87.

11

The court determined that, despite its indefinite duration, the contract was not terminable at will. *Id*. at 89. Unlike other cases where the contract imposed substantial obligations on the parties, "Leader's *non-exclusive* right to the use of the Results' systems does not impose any obligations on UCC for an indefinite period of time." *Id*. at 88 (emphasis in original). The court also noted that the parties clearly "did not intend to create an agreement terminable at the will of either party." *Id*. This case is distinguishable from *Leader* in terms of context and obligations. In *Leader*, the former defendant in a lawsuit was attempting to cancel a settlement agreement made two days before trial. *Id*. But more importantly, unlike in *Leader*, the exclusive license imposed significant obligations on Fluorogas.

Thus, FOC's arguments that the MOU should fall outside of the general rule are unconvincing. The MOU is an indefinite length contract, and therefore terminable at will. FOC contends that it would generally be unfair for a licensor to be able to terminate at any time for any reason. For that reason, courts often read a reasonable term into otherwise terminable indefinite contracts.

**Should a reasonable term be implied?**

The Texas Supreme Court has recognized that, in certain circumstances, a reasonable time should be read into an otherwise terminable-at-will contract:

12

> We are not unmindful of the fact that in dealing with exclusive franchise or distributorship agreements, which are indefinite in duration and which contemplate the expenditure of substantial sums of money or other investments by one of the parties preparatory to or in accordance with his performance under the contract, the courts often imply a term of reasonable duration during which time the agreement is not terminable at will.

*Clear Lake*, 549 S.W.2d at 391 (citations omitted). The specifics of such an implied term remain somewhat unclear. For example, the *Clear Lake* passage describes implying a reasonable term as something that courts "often" do, not as a requirement.[7] And the court in *Clear Lake* did not have to decide whether to imply this term into the particular contract. *Id.* Similarly, in *Trient*, we did not determine whether a reasonable duration should be read in (or what that duration should be) because it concluded that any reasonable term had already passed. *Trient*, 83 F.3d at 711.

Fluorogas argues that FOC has not established one of the requirements for implying a reasonable term because it failed to present evidence that it had spent substantial sums of money. *Clear Lake* and *Trient* both indicate that a contract's

---

[7]Texas courts have carved out one clear exception to implying a reasonable duration term. This exception notes that government entities cannot enter contracts that limit their governmental powers. The contract in *Clear Lake* served that purpose; therefore the court would not read a reasonable term into it. *Clear Lake*, 549 S.W.2d at 392. *See also City of Corpus Christi v. Taylor*, 126 S.W.3d 712, 722-23 (Tex. App. – Corpus Christi 2004, no pet. h.) (applying *Clear Lake* to a similar contract).

13

contemplation of a party's substantial expenditure is a prerequisite for reading in a reasonable duration contract term. *Trient*, 83 F.3d at 704; *Clear Lake*, 549 S.W.2d at 391. Fluorogas argues that the district court improperly deprived it of a jury finding on this issue by instructing the jury that this contract fit within the exception, rather than asking the jury whether FOC had expended a substantial sum of money.

Fluorogas specifically argues that FOC did not lease any office space, built no manufacturing facilities, made no royalty payments, hired no employees, and paid no salaries before the termination. In fact, Fluorogas argues, FOC made a profit during the six months the MOU was in effect: it paid $130,000 for the Fluorogas generator, which it sold to Applied for $222,000. In response, FOC cites testimony by Frederick Siegele that he spent $200,000 in expenses[8] and argues that it "invested six months of time exclusively working under the MOU." FOC also contends that it "used its goodwill to introduce Fluorogas's technology to Applied." These expenditures of other investments, namely time and goodwill, justify the imposition of a reasonable term. In sum, the district court did not err in concluding that the MOU

---

[8] According to Fluorogas, this amount includes the amount FOC paid to Fluorogas for the generator it sold at a profit (and therefore was essentially reimbursed for this amount) and reimbursement for Hodgson's trip to Florida, which FOC had agreed to pay before entering the MOU. Fluorogas also contends that the $200,000 includes tax on the profit it made off the generator. FOC does not challenge any of these characterizations of the alleged $200,000.

contemplated that FOC would expend a substantial sum of money in fulfilling its obligations and that, thus, a reasonable term should be implied into the MOU.[9]

**Did FOC establish the elements of its fraud claim?**

Fluorogas further argues that the district court should have granted its motion for judgment as a matter of law because FOC failed to present evidence of each element of its fraud claims.

Under Texas law, a fraud claim includes the following elements:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). To show fraud based on a promise of future performance, a plaintiff must also show that the person making the promise had no intention of performing <u>at the time he made the promise</u>. *Id*. Failure to perform a contract, however, is not evidence of fraud. *Formosa Plastics*, 960 S.W.2d at 48.

FOC's fraud allegations are not very specific. FOC contends that Fluorogas made the following fraudulent representations:

---

[9]Neither party challenges the jury's finding that five years was a reasonable term for the MOU.

(1) Fluorogas failured to inform FOC of its interpretation of the contract: "Hodgson never informed FOC that he believed he could cancel the MOU at any time, although that is exactly what he intended to do as early as December of 2000;"

(2) While negotiating and signing the MOU, Hodgson represented that he intended to give FOC access to Fluorogas' licensed technology, while never intending to do so;

(3) Hodgson said that his dealings were aboveboard;

(4) Hodgson "repeatedly confirmed Fluorogas's commitment to the MOU" while having secret meetings with Applied; and

(5) While discussing the settlement of the first lawsuit, Hodgson never told FOC that he would terminate the MOU.

FOC further alleges that it relied on these representations, specifically by:

(A)   entering into the MOU;
(B)   hiring Robert Jackson as its vice president;
(C)   incurring expenses;
(D)   showing Fluoroga's technology to their business contacts; and
(E)   dropping the first lawsuit.

In support of these allegations, Stephen Siegele testified that he never would have taken any of the above actions had he known that "Fluorogas believed that it was not bound by the MOU, believed it could cancel at any time, never intended to give FOC access to the background technology or intended to act in a way that was inconsistent with its representations to FOC."

Many of FOC's allegations of fraud are problematic. For example, FOC complains about Hodgson's failure to tell it about secret meetings with Applied, but failure to disclose can only be

fraud if there is a duty to disclose. *Trustees of NW Laundry & Dry Cleaners Health & Welfare Trust v. Burzynski*, 27 F.3d 153, 157 (5th Cir. 1994). FOC's claim based on failure to disclose is deficient because FOC has not pleaded or argued any exception that would have given Fluorogas a duty to disclose.

In addition, FOC has no injury that can be attributed to the alleged fraudulent representations. FOC never paid Robert Jackson a salary, and it dismissed its first lawsuit without prejudice. As for the claim that Fluorogas never intended to provide access when it entered into the contract, no connection exists between this particular aspect of the MOU and any of FOC's purported reliance or damages: FOC's damages were based solely on the value of the exclusive right.

Thus, the only fraud claim that remains is the fraudulent inducement claim – that Fluorogas entered the MOU never intending to comply with it. And for this, FOC only presents evidence that Hodgson testified that he believed he could terminate at any time and that by December 2000, he intended to terminate. Even viewed in FOC's favor, this is not evidence that Hodgson entered the contract without intending to perform. Therefore, the district court erred in denying Fluorogas's and BOC's motion for judgment as a matter of law on FOC's fraud claim. Because the punitive damages were based on this fraud claim, the award of punitive

17

damages cannot stand.[10]

**Did FOC establish its lost-asset damages?**

The jury awarded FOC $170,000 in reliance damages and $120 million in "loss of income-producing asset" damages.[11]  Fluorogas challenges the calculation of the lost asset damages, arguing that FOC did not prove them with reasonable certainty.

General standard – lost asset

FOC based its lost asset theory on a Second Circuit case, *Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000).[12]  In *Schonfeld*, the Second Circuit determined that the plaintiff could recover, as consequential damages, the value of the asset (in that case, broadcast contracts) it lost because of the defendant's breach.  The lost value measure of damages is the "market value of the asset at the time of breach – not the lost profits that the asset could have produced in the future."  *Id.*

---

[10]Under Texas law, punitive damages are not available for breach of contract.  *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 745 (Tex. 1986).

[11]FOC dropped its request for lost profit damages.

[12]Neither side has cited any Texas cases in which this damage theory was used.  FOC indicates that *Aboud v. Schlichtmeier*, 6 S.W.3d 742 (Tex. App. – Corpus Christi 1999, no pet.) contained a similar analysis of "lost opportunities."  However, the points of error in *Aboud* indicate that it concerned lost profits, although one of the experts phrased this as the present value of the lost business opportunities.  Moreover, we have referred to *Aboud* as a case in which a Texas court permitted a plaintiff to recover lost profits.  *Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E-Sys., Inc.*, 257 F.3d 461, 467 (5th Cir. 2001).

18

at 176.  This amount is connected to "a buyer's projections of what income he could derive from the asset in the future."  *Id*.  In describing the measure, the Second Circuit quoted Dobbs Law of Remedies: "Market value damages are 'based on future profits as estimated by potential buyers who form the 'market' and 'reflect the buyer's discount for the fact that the profits would be postponed and . . . uncertain.'"  *Id*. (quoting DAN B. DOBBS, DOBBS LAW OF REMEDIES § 3.3(7) (1993)).  The court noted "[t]he same kind of market-value proof is sometimes required to prove general damages to prove 'hybrid' damages for the loss of an income-producing asset.  But the two remain analytically distinct."  *Id*. at 176-77.

*Schonfeld* itself examined the difference.  In *Schonfeld*, the Second Circuit first concluded that the plaintiff's lost profit damages were too speculative to recover.  *Id*. at 173.  But the court noted that "[t]he market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time.  It represents what a buyer is willing to pay for the chance to earn the speculative profits."  *Id*. at 177.  The *Schonfeld* court discussed several methods for determining the market value in the absence of a standardized market or exchange: "experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced."  *Id*. at 178.  Still, the court noted, "it is

19

well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." *Id* at 178. Eventually, the court concluded that evidence of the price that a buyer had been willing to pay for the contracts, along with expert testimony, could provide sufficient evidence of the contracts' market value. *Id*. at 183.

In short, under *Schonfeld*, the market value is determined by considering what a hypothetical buyer would pay for the chance to earn future profits. And the best evidence of this value is an actual sale of the asset.

FOC relied on expert testimony to calculate the value of its lost asset – the exclusive license. FOC's expert, Walter Bratic, provided a damage estimate of $130 million. Bratic reached this amount by using two different lost-profit models based on various projections, including some from BOC. Bratic used an 11-year reasonable contract period for these calculations,[13] and then discounted that stream of future profits to present value.

Yet Bratic did not analyze what a buyer would have paid for the chance to make these profits, as *Shonfeld* requires. *Schonfeld*, 218 F.3d at 177. In fact, Bractic testified:

> Q:   You've done no analysis whatsoever of what a
> willing buyer would be willing to pay for the MOU on

---

[13]The jury concluded that the reasonable term was five years, not eleven.

20

February 23rd 2001; is that correct?
A:   Well -no.  I haven't done an analysis of what a
willing buyer, willing seller would have paid for the
MOU on the date it was canceled.

Thus, Bratic did not do any of the calculations that distinguish a lost asset damage model from a straightforward lost-profits one.  Instead, he calculated the value based solely on expected future profits.  Because of this, the record contains no evidence of the market value of the exclusive license.

Although FOC argues that "magic words" should not be required, the issue here is not one of magic words, but of the expert's method.  The only evidence of damages – Bractic's testimony – reflects a speculative lost-profit analysis and fails to show any evidence of the fundamental aspect of its own damage theory.  For that reason, we reverse the $120 million award of lost asset damages.[14]

**BOC's Derivative Liability**

The jury found two bases for derivative liability against the BOC entities.  First, it determined that Fluorogas acted as the alter ego of The BOC Group plc, its parent corporation.  Second, it found that Fluorogas, The BOC Group plc, and The BOC Group, Inc. were operating as a single business enterprise.  Based on these findings, the district court entered a judgment holding Flurogas, The BOC Group plc, and The BOC Group, Inc.

---

[14]Fluorogas and BOC did not challenge the award of $170,000 in reliance damages.

jointly and severally liable for the entire amount of damages.

As noted, FOC proceeded under two distinct theories of derivative liability under Texas law – alter ego (against BOC Group plc) and single business enterprise (against BOC Group plc and The BOC Group, Inc.).  Under the alter ego theory, "where a corporation is organized and operated as a mere tool or business conduit of another corporation," the first corporation's wrongful acts are properly attributed to the controlling corporation. *Menetti v. Chavers*, 974 S.W.2d 168, 173 (Tex. App. – San Antonio 1998, no pet.).  The single business enterprise theory imposes derivative liability in a slightly different context: "when corporations are not operated as separate entities but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for debts incurred in pursuit of that business purpose."  *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex. App. – Houston [14th Dist.] 1986, writ ref'd n.r.e.).

Both theories, therefore, presume that the corporations are unified at the time of the wrongful act.[15]   It is illogical, for

---

[15] See *United States v. Wallace*, 961 F. Supp. 969, 979 (N.D. Tex. 1996) ("Under general corporate law principles, the relevant inquiry into the control issue focuses on the relationship between the parent and the subsidiary at the time the acts complained of took place.") (citing *Craig v. Johns-Manville Corp.*, 1987 WL 10191,(E.D.Penn. Mar. 31, 1988; W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, Sec. 43.10, at 490; *Wm. Passalacqua Builders v. Resnick Developers*, 933 F.2d 131, 138 (2nd Cir. 1991); *Radaszewski By Radaszewski v. Telecom Corp.*, 981

22

example, to hold a parent liable for controlling another corporation's debts when it had no control at the time the debts were incurred.  So, "[i]n alter ego cases, the unfairness consists, not in fraud, but in the fact that the dominant shareholder or parent entity, because it controls the subservient company, is the party responsible for creating the subservient's debts."  *Riquelme Valdes v. Leisure Res. Group, Inc.*, 810 F.2d 1345, 1353 (5th Cir. 1987).[16]  Thus, BOC argues that it could not be liable under either theory because it had no relationship with Fluorogas at the time Fluorogas terminated the MOU.  FOC does not seriously challenge this principle and only cites cases involving fraudulent transfers to avoid a debt, not alter ego or single business enterprise.[17]

Instead, BOC argues that Fluorogas has, since February 23, 2001, continuously breached its obligations under the MOU. Because this breach continued after BOC's acquisition of

---

F.2d 305, 306 (8th Cir. 1992)).

[16]*Riquelme Valdes* was decided under earlier Texas law, which did not require any showing of fraud to pierce the corporate veil.  The Texas legislature amended earlier law by passing Article 2.21 of the Texas Business Corporation Act, which added an actual fraud requirement. TEX. BUS. CORP. ACT art. 2.21(A)(2) (Vernon 2003).  The addition of the fraud requirement, however, does not alter the fundamental reasoning behind alter ego derivative liability – that the dominant corporation is actually creating the debts.

[17]At trial and on appeal, FOC only proceeded under alter ego and single business enterprise theories.  It did not plead or prove fraudulent transfer.

Fluorogas, FOC contends, BOC is derivatively liable under both theories. FOC argues that Fluorogas and BOC has continued to deny it access to the technology and that Fluorogas and BOC had a duty to refrain from directly marketing or selling fluorine generators for CVD processes to potential customers. FOC further maintains that Fluorogas and BOC violated this duty by "embarking on a campaign to market and sell that technology directly to the semiconductor industry." In so doing, FOC characterizes the February 23, 2001 letter, which it elsewhere calls a breach, as nothing more than a "repudiation."

Regardless of the general validity of the continuing violation theory, it is important to note two things about this case. First, the jury was asked whether "Fluorogas failed to comply with the MOU <u>by terminating or attempting to terminate the MOU on February 23, 2001</u>, before the expiration of the reasonable term." (Emphasis added.) This question, and one about harm "from Fluorogas's failure to comply with the MOU by terminating or attempting to terminate the MOU," were the only jury questions about breach of contract. Thus, the jury did not consider any breach after February 23, 2001, much less any breach based on a post-acquisition marketing campaign. Second, the district court instructed the jury to calculate damages as of February 23, 2001.

Despite this, FOC contends that it did not have to accept the repudiation and may still demand continued performance. As support, FOC cites cases about anticipatory breach and

24

repudiation, such as *Murray v. Crest Construction, Inc.*, 900 S.W.2d 342, 344 (Tex. 1995). In *Murray*, the court stated "[w]e have long recognized the rule of anticipatory breach: the repudiation of a contract before the time of performance has arrived amounts to a tender of breach of the entire contract and allows the injured party to immediately pursue an action for damages." *Id*. at 344. As suggested by that passage, the repudiation in *Murray* was <u>anticipatory</u>, occurring before any performance was due: "Crest repudiated the Beaumont settlement agreement by informing Murray that it would not perform on the promissory note when its performance became due." *Id*. This is not the case here; FOC had obtained the exclusive license and then Fluorogas terminated the license. Although the duration of the contract had not run, there was nothing anticipatory about this termination, even if it was a breach.

Even so, FOC has sued for total breach of contract damages, and has not sued based on any theory of anticipatory breach or continuing breach. FOC's citation to *Brighton Homes, Inc. v. McAdams*, 737 S.W.2d 340 (Tex. App. – Houston [14th Dist.] 1987, writ ref'd n.r.e.), only emphasizes this problem. FOC cites *Brighton Homes* for the idea that a plaintiff's damage amount cannot be restricted to the amount caused by the very first breach when later instances of breach also cause property damage. *Brighton Homes* was a Deceptive Trade Practices Act suit involving

25

failure to build a house in a workmanlike manner.  *Id*. at 341.
The builder challenged the amount of damages, arguing that only
damage incurred the very first moment of breach was recoverable.
*Id*. at 342-43.  The court disagreed.  *Id*. at 343.  The builder's
failure to repair was continuing, and the purchaser could recover
for all the damage this failure caused until the time of trial,
not just the first instance of damage the purchaser noticed,
because "[w]here there is a continuing cause of damage, measuring
the damage immediately after the initial injury would be unduly
restrictive and would not compensate plaintiffs fully for their
injury."  *Id*. at 343.  Here, in contrast, FOC sued for the total
value of its lost asset as of February 23, 2001.  All the damage
from the future use of its asset is measured at that time; there
is no need for a continuing measure of damages.

A similar problem arises in FOC's analogy to rent cases.
FOC cites *Austin Hill Country Realty, Inc. v. Palisades Plaza,
Inc.*, 948 S.W.2d 293, 300 (Tex. 1997) for the proposition that a
landlord may, in the face of a tenant's repudiation, maintain the
lease and sue for rent as it comes due.  *Austin Hill Country
Realty* confirms that this is one of a landlord's four options for
dealing with a tenant's failure to pay rent.  *Id*.  But again,
FOC's actions are distinguishable; it did not bring a separate
suit each time performance came due.  It brought one suit for

breach less than three weeks after the termination letter.[18]  Its

derivative claims based on alter ego or single business

enterprise, then, are not saved by an attempt to call Fluorogas's

conduct a continuing breach.

Thus, BOC cannot be held derivatively liable for the claims

under either an alter ego or single business enterprise theory

because the claims all arose before BOC acquired Fluorogas.  We

reverse the judgment against the two BOC entities.

**Cross Appeal Issues**

The district court granted summary judgment on the tortious

interference and conspiracy claims against BOC, Inc. and all of

FOC's claims against Applied.[19]  In granting summary judgment,

the district court accepted the magistrate judge's report and

recommendation.  In accepting this recommendation, the district

court emphasized that "[a]fter pointing out discrepancies between

what FOC contended its evidence said and what it actually said,

the Magistrate determined that the evidence showed that Applied

---

[18]One of the cases that FOC cites, *Hampton v. Minton*, 785
S.W.2d 854, 858 (Tex. App. – Austin 1990, writ denied), notes
that "the rule requiring the non-breaching party to 'accept,' by
words or conduct, the breaching party's repudiation has not
received favorable treatment by recent authorities and, in any
event, has generally been applied in the context of an
anticipatory repudiation."

[19]BOC plc did not move for summary judgment because it was
contesting personal jurisdiction.  FOC argues that it did not
pursue its claims against BOC plc at trial because the district
court, in a pretrial conference, stated that FOC's claims against
BOC were limited to derivative liability.

did not tortiously interfere with the MOU." FOC appeals both summary judgment rulings.

The district court's grant of summary judgment is reviewed *de novo*, using the same standards as the district court. *Union Pac. Res. Group, Inc. v. Rhône-Poulenc, Inc*, 247 F.3d 574, 583 (5th Cir. 2001). A movant is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In reviewing a motion for summary judgment, a court must make all inferences in favor of the nonmoving party. *Union Pac. Res. Group*, 247 F.3d at 583. Yet, "[g]uesswork and speculation simply cannot serve as a basis for sending a case to a jury." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996). Likewise, we have emphasized that "unsubstantiated assertions are not competent summary judgment evidence." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

Tortious Interference with Contract

The elements of a tortious interference with contract claim are:

    (1)  the existence of a contract subject to  interferen
                                                 ce;
    (2)  a willful and intentional act of interference;
    (3)  such act was a proximate cause of damage; and
    (4)  actual damage or loss occurred.

28

*Thrift v. Hubbard*, 44 F.3d 348, 356 (5th Cir. 1995) (citing *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex. 1993)). To show tortious interference, a plaintiff is not required to prove that the defendant acted with intent to injure. *Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992). The plaintiff must, however, establish that the defendant's interference with the contract was intentional. *Id*.

Tortious Interference Claim against BOC

When ruling on the summary judgment motion, the magistrate judge concluded that FOC failed to present any evidence that BOC contacted Fluorogas before the termination on February 23, 2001. Logically then, BOC could not have proximately caused FOC any damage. Although implying that BOC's timing was suspicious, FOC still does not argue that BOC contacted Fluorogas before February 23, 2001.[20] FOC's tortious interference claims against BOC are solely based on its theory that Fluorogas's termination was only an anticipatory breach, which FOC refused to accept.[21] For the

---

[20]FOC's Cross Appeal issue 3 contends that the court erred in granting summary judgment on its claim against BOC "despite overwhelming evidence that BOC unlawfully induced Fluorogas to breach the MOU <u>after</u> February 23, 2001..." (Emphasis added.)

[21]FOC also relies heavily on two unpublished cases, *Int'l Minerals & Res. S.A. v. Bomar Res., Inc.*, 5 Fed. Appx. 5, 2001 WL 1976691 (2d Cir. 2001) and *Int'l Minerals & Res. S.A. v. Am. Gen. Res., Inc.*, No. No. 87 CIV. 3988 HB, 1999 WL 672907 (S.D.N.Y. 1999). Both cases involve English contract law and anticipatory breach: a party entered into a contract to sell a boat, but

29

reasons stated in the derivative liability section, this argument lacks merit. The district court properly granted summary judgment on this claim.

Tortious Interference Claims against Applied

In its motion for summary judgment, Applied argued that it did not proximately cause FOC's damages. In determining that FOC failed to present evidence to show a fact question on this claim, the magistrate judge analyzed FOC's evidence, finding that "many documents cited by Plaintiff do not say what Plaintiff says they say." The magistrate judge concluded that, at most, the evidence showed Applied had spoken to Fluorogas and that it had not informed FOC of this meeting. The magistrate also concluded that the evidence only showed that this meeting concerned Applied's possible investment in Fluorogas, and that no discussions about breaching or terminating the MOU occurred.

Much of FOC's argument is based solely on suspicion, not on evidence. For example, FOC cites an October 17, 2000 letter Fluorogas sent to Applied that stated "[s]ince your intended end use for the fluorine is CVD chamber cleaning, we have concluded that we are unable to directly supply Applied Materials. To do so would breach our exclusive agreement with Flourine-on-Call."

---

before the time when the sale was to occur, the seller agreed to sell it to someone else. The district court concluded that the original repudiation, which occurred before the time of performance, was not a breach. *Int'l Minerals & Res.*, No. 87 CIV. 3988 HB, 1999 WL 672907 at *3.

30

This letter, according to FOC, is evidence that "[i]ndeed Fluorogas attempted to create the appearance that it was going to resist Applied's interference and instead honor the contract .. .. Hodgson's letter and the [first] FOC lawsuit served only to drive Applied underground, so that thereafter it was more circumspect in pursuing – and more skillful in hiding – its acts of interference."  Similarly, FOC describes, without citation, proposal requests as evidence of its theory that "Applied pretended to renew its interest in working with FOC."  These unsubstantiated assertions cannot constitute summary judgment evidence.

Nevertheless, some of FOC's assertions go beyond mere suspicion.  For example, FOC presented the handwritten notes of an Applied executive, Jeet Harika, from an internal Applied meeting on September 5, 2000.  These notes included the comment "? get off FOC agreement."  In response, Applied directs us to Harika's deposition testimony, which indicates that this was his own internal note, not the subject of discussion at the meeting. Additionally, FOC provided an email that Hodgson drafted in October 2000, but did not send, about Applied trying to drive a wedge between FOC and Fluorogas.  Finally, FOC presented a February 6, 2001 email from Harika to Hodgson, reading "I would like to talk about a few items with you.  Can you please let me know best [sic] time to get in touch with you."  While both the note and the email have innocent explanations as well, which

31

explanation to accept is a question that should be decided by the jury. So, too, while Applied cites evidence that would strongly argue against tortious interference, this evidence cannot resolve the issue on summary judgment.[22]

Conspiracy Claims against BOC and Applied

Finally, FOC challenges the district court's conclusion that it failed to present a fact question concerning its conspiracy claims against BOC and Applied. The elements of a conspiracy claim under Texas law are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

FOC essentially concedes that it can present no actual evidence of a pre-February 23, 2001 conspiracy. Instead, FOC

---

[22]Applied also offers an alternative basis for affirming the summary judgment motion by arguing that, based on expert testimony (and Siegele's testimony), the language "for use in the Chemical Vapor Deposition ('CVD') process, excluding etch applications," excluded post-process cleaning. Applied contends that it only sought the generators for this excluded post-process cleaning. As FOC correctly contends, its claims are based more than on interfering with the exclusive rights, but also includes the denial of access to technology and the termination of the entire relationship with FOC. The definition of "CVD process" is not relevant to those aspects of the claims.

Similarly, we reject Applied's contention that FOC's claims are presently barred by election of remedies. A party may plead inconsistent theories arising from independent wrongs. *See Thornton, Summers, Biechlin, Dunham & Brown, Inc. v. Cook Paint & Varnish*, 82 F.3d 114, 117 (5th Cir. 1996).

32

argues that despite the BOC executive's testimony – that Applied originally asked BOC to partner with 3M, that Applied never mentioned Fluorogas's name, that when touring the Applied facility the company's name on the generator was covered, and that BOC discovered Fluorogas by performing internet searches[23] – summary judgment was inappropriate on the claims that BOC was involved with a conspiracy.  With this, FOC argues that the BOC executive's credibility alone creates a fact question for the jury.  Without evidence, however, FOC does not have enough for its claims against BOC to survive summary judgment.[24]  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (nonmovant cannot merely cast doubt on movant's statements but must rather produce its own evidence to defeat summary judgment).  Therefore, the district court did not err in granting summary judgment on this claim.  Because summary judgment was proper on the conspiracy claim against BOC, summary judgment was also proper on the conspiracy claim against Applied.

**Attorney's Fees**

The district court awarded FOC $24 million in attorney's

---

[23]On February 27, 2001, an internal email with a link to Fluorogas's web site was circulated within BOC.

[24]FOC also argues that the magistrate ignored facts that the executive changed his story about the date of a meeting with Applied where Fluorogas' name had not been raised (neither date was before the termination of the MOU) and that BOC contacted Fluorogas on March 2 with a confidentiality agreement.  Neither of these facts should defeat summary judgment.

fees for its breach of contract claim.  This amount consisted of $1,740,770.17 for time actually spent by its lawyers; $22,458,267.28 under a contingency fee arrangement; $50,000 for post-verdict work, and $65,000 for appeal.  We review the attorney's fees award for an abuse of discretion.  *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1988).  We review any fact finding underlying this award for clear error.  *Id.*

Under Texas law, a party who recovers damages for a breach of contract claim may recover reasonable attorney's fees.  TEX. CIV. PRAC. & REM. CODE § 38.001(8) (Vernon 1997); *Green Int'l Co. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).  If a party has recovered on such a claim, an award of reasonable fees is mandatory.  *Mathis v. Exxon Corp.*, 302 F.3d 448, 462 (5th Cir. 2002).  The amount of reasonable fees, however, is discretionary.  *Id*.  The Texas Civil Practice and Remedies Code provides a rebuttable presumption that usual and customary fees are reasonable.  TEX. CIV. PRAC. & REM. CODE § 38.003(Vernon 1997).  In a proceeding before the court, the judge may take judicial notice of reasonable and customary fees, along with the case file.  TEX. CIV. PRAC. & REM. CODE § 38.004 (Vernon 1997).

The Texas Supreme Court has outlined eight relevant factors for courts to consider when determining the reasonableness of an attorney's fee award:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 818 (Tex. 1997). Although a contingent contract is relevant to this determination, a contingent fee contract is not alone enough to support an award of fees. *Id*. at 818-19. Yet affirming an award based on a contract is not unheard of. In *Mathis*, we affirmed the award of a 40% contingency fee, citing two Texas cases, *Laredo Indep. Sch. Dist. v. Trevino*, 25 S.W.3d 263 (Tex. App. – San Antonio 2000, pet. denied) and *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 58-59 (Tex. App. – Dallas 1995, no writ) (decided before *Arthur Andersen* ).

In this case, FOC's lawyers had a "blended" fee agreement under which they worked at a reduced hourly rate but also had a contingency agreement. This agreement resulted in a total hourly fee of $1,643,157.45 (at the reduced rate) and a contingency fee of $22,438,513. These amounts appear in the district court's

35

order.

Using the regular hourly rate of FOC's lawyers, BOC and Fluorogas calculate the actual lodestar amount of fees at $3.3 million, although they also contend that this is an overstatement. Under this calculation, the $24 million represented an eight-fold enhancement of the lodestar amount. The district court abused its discretion in awarding such a vast amount of fees, particularly since it originally did so before providing BOC and Fluorogas with an opportunity to respond. Furthermore, in light of our reversal of the lost-asset damages, the results obtained by FOC's lawyers have changed.[25] We therefore remand the attorney's fee award to the district court for reconsideration.

**Conclusion**

For the reasons discussed in this opinion, we REVERSE the judgment in favor of FOC on the fraud claims and render judgment in favor of Fluorogas on those claims; REVERSE the award of punitive damages; REVERSE the judgment in favor of FOC against The BOC Group, Inc and The BOC Group PLC on the contract claims and RENDER judgment in favor of The BOC Group, Inc and The BOC Group PLC on those claims; REVERSE the grant of summary judgment in favor of Applied on the tortious interference with contract

---

[25]Given FOC's limited recovery following this appeal, we fail to see how any enhancement beyond the lodestar amount would be justified in this case.

claim and REMAND that claim to the district court; and REVERSE and REMAND the award of attorney's fees.  We AFFIRM the district court's judgment in all other respects.

REVERSED and RENDERED in part; REVERSED and REMANDED in part; AFFIRMED in part.